# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                     No. CR 11-2563 JB

JULIO REYES-VENCOMO,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion and Memorandum Brief to Suppress Evidence Recovered From the Defendants' [sic] Vehicle and Post-Arrest Statements of the Defendant, filed November 30, 2011 (Doc. 31)("Motion to Suppress"). The Court held an evidentiary hearing on January 27, 2012. The primary issues are: (i) whether Defendant Julio Reyes-Vencomo's continued detention, after providing officers his vehicle registration and proof of insurance, constituted an unlawful seizure under the Fourth Amendment to the United States Constitution; (ii) whether Taos, New Mexico Police Officer Virgil Vigil's request for Reyes-Vencomo's Social Security number exceeded the lawful scope of the traffic stop; and (iii) whether the inventory search was valid. The Court will deny the Motion to Suppress. The Court finds that law enforcement officers lawfully detained Reyes-Vencomo to investigate and confirm his identity. The request for Reyes-Vencomo's Social Security number did not exceed the lawful scope of the traffic stop, because Reyes-Vencomo could not provide his driver's license and the officer was attempting to confirm his identity. Furthermore, the inventory search was conducted in compliance with standardized police procedures for a non-investigatory purpose.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires that the Court state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order are the Court's essential findings for rule 12(d)'s purposes. The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search. See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege."). Thus, the Court may consider hearsay in ruling on a motion to suppress. See United States v. Garcia, 324 F.App'x 705, 708 (10th Cir. 2009)(unpublished)(recognizing that it was not necessary to "resolve whether Crawford's[1] protection of an accused's Sixth Amendment confrontation right applies to suppression hearings," but indicating that Tenth Circuit precedent prior to Crawford v. Washington does not provide such protection); United States v. Merritt, 695 F.2d at 1269; United States v. Christy, No. 10-1534, 2011 WL 3933868, at *2 (D.N.M. Sept. 2, 2011)(Browning, J.)("Thus, the Court may consider hearsay in ruling on a motion to suppress."); United States v. Hernandez, 778 F.Supp.2d 1211, 1226 (D.N.M.

---

[1] Crawford v. Washington, 541 U.S. 36 (2004).

2011)(Browning, J.)(concluding "that Crawford v. Washington does not apply to detention hearings").

      1.     On August 9, 2011,  Vigil and Police Trainee Officer Stephen Ortega stopped Reyes-Vencomo while Reyes-Vencomo was operating his motor vehicle near his home in Taos.  See Transcript of Hearing at 13:2-19 (January 27, 2012)(Torrez, Vigil)("Tr.").[2]

      2.     Vigil and Ortega stopped Reyes-Vencomo and executed a traffic stop, because they observed Reyes-Vencomo failing to stop at a stop sign, and  exceeding the posted speed limit.  See Tr. at 13:2-19 (Torrez, Vigil); id. at 82:15-83:2 (Torrez, Ortega); State of New Mexico Uniform Traffic Citation for Failing to Complete a Stop (dated August 10, 2011)(Govt's Ex. 2 at hearing)("Stop Sign Citation"); State of New Mexico Uniform Traffic Citation for Going 40 Miles Per Hour in a 25 Miles per Hour Zone (dated August 10, 2011)(Govt's Ex. 3 at hearing)("Speeding Citation").

      3.     This traffic stop was Ortega's first stop where he would make contact with the driver.  See Tr. at 14:13-19 (Torrez, Vigil).

      4.     While investigating the driver, Ortega, accompanied by Vigil, approached Reyes-Vencomo's vehicle and, pursuant to standard police procedure, asked Reyes-Vencomo for his driver's license, vehicle registration, and proof of insurance.  See Tr. at 15:18-9 (Torrez, Vigil); id. at 83:16-21 (Torrez, Ortega); Grand Jury Testimony of Virgil Vigil at 5:17-23 (Vigil)(Govt's Ex. 6 at hearing)("Vigil GJ Testimony").[3]

---

    [2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

    [3]Reyes-Vencomo testified that Ortega asked him for only his insurance card and did not request his driver's license.  See Tr. at 72:16-21 (Torrez, Reyes-Vencomo).  Both Vigil and Ortega noted in their testimony that Ortega asked for Reyes-Vencomo's driver's license, vehicle

5.      Reyes-Vencomo provided the officers with his vehicle registration information and

proof of insurance on the vehicle, informed the officers where he lived, and gave his full name, but

indicated that he did not have a driver's license or identification. See Tr. at 17:19-23 (Torrez, Vigil);

id. at 85:22-86:7 (Torrez, Ortega); State of New Mexico Uniform Traffic Citation for Driver Unable

to Provide Driver's License (dated August 10, 2011)(Govt's Ex. 1 at hearing)("License Citation").[4]

---

registration, and proof of insurance. See Tr. at 15:18-9 (Torrez, Vigil); id. at 83:16-21 (Torrez, Ortega). Furthermore, both their incident reports indicate that Ortega asked Reyes-Vencomo for his driver's license, vehicle registration, and proof of insurance. See Vigil Incident Narrative at 1 (Def.'s Ex. A at hearing)("Vigil Report"); Ortega Incident Narrative at 1 (Def.'s Ex. C at hearing)("Ortega Report"). Ordinarily, officers will ask a driver for a driver's license so that they can confirm that the driver is licensed to drive the car and confirm the driver's identity. The Court does not believe that a trainee officer, who was on his first traffic stop, would likely fail to ask such a basic question. Furthermore, in Reyes-Vencomo's recitations of the facts in his reply, see Reply to Memorandum Brief in Opposition to Motion to Suppress Evidence Recovered from the Defendants' [sic] Vehicle and Post-Arrest Statements of the Defendant, filed January 2, 2012 (Doc. 41)("Reply"), he indicates that he "told the police officer that either didn't have a driver's license or did not have one in his possession, and that all other documents . . . that were requested were produced." Reply at 1. Thus, Reyes-Vencomo's own recitation of the facts implies that the officers requested his driver's license. Given that requesting a driver's license is a routine request and necessary for other steps of a traffic stop, and given Reyes-Vencomo's representations in his Reply, the Court credits the officers' testimony that Ortega requested his driver's license, vehicle registration, and proof of insurance.

[4]Reyes-Vencomo testified that Vigil yelled at him, "You Mexicans are all the same," and ordered him out of the vehicle. Tr. at 71:6-9 (Torrez, Reyes-Vencomo). See id. at 77:2-7 (Torrez, Reyes-Vencomo). Ortega denied that Vigil made such disparaging remarks and stated that he would confront an individual if he or she made remarks like that in front of him. See Tr. at 84:7-4 (Torrez, Ortega). Reyes-Vencomo described Vigil as walking up to him and immediately began yelling at him. This scenario is inconsistent with Reyes-Vencomo's contention later in his testimony that it was Ortega, described as the nice officer, who came up to him and, after asking for his insurance information, ordered him out of the vehicle. See Tr. at 72:7-15 (Torrez, Reyes-Vencomo). At this point in his testimony, Reyes-Vencomo also asserted that Vigil was the first officer to speak to him. See Tr. at 76:25-77:1 (Torrez, Reyes-Vencomo). This statement is inconsistent with the officers' testimony that Ortega approached Reyes-Vencomo to conduct his first traffic stop. See Tr. at 14:13-19 (Torrez, Vigil); id. at 83:16-18 (Torrez, Ortega). The Court finds Reyes-Vencomo's statement that Vigil immediately ordered him out of the vehicle unlikely. Officers are generally very conscious of their safety during traffic stops, and the Court finds it unlikely that an experienced officer would immediately order an unidentified driver out of his vehicle. For the same reason, the Court finds it unlikely that an officer would immediately begin yelling at an unknown person. The

-4-

6.      Vigil then asked Reyes-Vencomo to provide some form of identification, his name, date of birth, and Social Security number[5] to verify Reyes-Vencomo's identity.  See Tr. at 18:8-20 (Torrez, Vigil).[6]

7.      Reyes-Vencomo then provided the officers with his date of birth and produced a Social Security card, giving it to Vigil.  See Tr. at 18:24-19:3 (Torrez, Vigil); Vigil Incident Narrative at 1 (Def.'s Ex. A at hearing)("Vigil Report"); New Mexico v. Reyes, No. M-53-FR-201100149, Statement of Probable Cause, dated August 11, 2011 (Def.'s Ex. B at hearing)("Probable Cause"); Ortega Incident Narrative at 1 (Def.'s Ex. C at hearing)("Ortega Report").

8.      Vigil noted that the card's coloring and writing did not appear to be correct, and suspected that the card was fake.  See Tr. at 19:12-19 (Torrez, Vigil); Vigil Report at 1; Probable Cause at 1; Ortega Report at 1.

9.      Vigil then stated to Reyes-Vencomo that he was not free to leave, as he was going

_____

Court concludes that Reyes-Vencomo's testimony on this fact was not credible, because of the internal inconsistencies in Reyes-Vencomo's testimony and the improbable assertion that Vigil ordered him out of the car as well as the manner in which he testified.  Accordingly, the Court finds that Vigil did not yell derogatory statements about Mexicans when he approached Reyes-Vencomo and did not order him out of the vehicle.

[5]Although there was some dispute, in the briefing and the oral arguments, whether Vigil asked for Reyes-Vencomo's Social Security card or his Social Security number, the only evidence introduced at the hearing was Vigil's testimony that he asked for a Social Security number.  See Tr. at 18:8-11 (Torrez, Vigil); id. at 32:2-8 (Juarez, Vigil); id. at 93:8-10 (Torrez, Ortega).  Accordingly, the Court finds that Vigil asked for Reyes-Vencomo's Social Security number.

[6]In his Reply, Reyes-Vencomo asserts that Vigil asked questions about his immigration status.  Motion to Suppress at 2; Reply at 1-2.  During the evidentiary hearing, however, neither Reyes-Vencomo nor any other witness testified that the officers asked him questions regarding his immigration status.  Accordingly, the Court will not find, by a preponderance of the evidence, that such questions were asked.

to "run" -- conduct a computer-assisted check on -- the Social Security card.  Tr. at 19:4-8 (Torrez, Vigil); id. at 37:17-23 (Juarez, Vigil).

10.     Vigil contacted dispatch and initiated a records check of the Social Security number that Reyes-Vencomo provided.  See Tr. at 19:25-20:1(Torrez, Vigil); Tr. at 38:11-14 (Juarez, Vigil); Vigil Report at 1; Probable Cause at 1.

11.     The officers ran the card, and it could not be confirmed as a valid card.  See Tr. at 20:2-3 (Torrez, Vigil); id. at 38:15-17 (Juarez, Vigil); Vigil Report at 1; Probable Cause at 1; Ortega Report at 1.

12.     Dispatch informed Vigil that no record existed matching the Social Security number that Reyes-Vencomo provided.  See Tr. at 20:2-3 (Torrez, Vigil); id. at 38:15-17 (Juarez, Vigil); Vigil Report at 1; Probable Cause at 1; Ortega Report at 1.

13.     Vigil then returned to Reyes-Vencomo's vehicle and asked him where he got his Social Security Card, to which Reyes-Vencomo responded that he had received it in New Mexico, through the mail.  See Tr. at 20:4-13 (Torrez, Vigil).

14.     This answer set off a "red flag" for Vigil, because Vigil knew that an individual has to personally retrieve his or her Social Security card.  Tr. at 20:13-14 (Vigil).

15.     Vigil informed Reyes-Vencomo that he was going to detain him for further investigation, as he believed that Reyes-Vencomo was in possession of a fraudulent Social Security card.  See Tr. at 20:15-20 (Torrez, Vigil); id. at 38:18-39:2 (Juarez, Vigil).

16.     Reyes-Vencomo became frustrated and, without the officers' prompting, exited his vehicle.  See Tr. at 20:21-23 (Torrez, Vigil); id. at 33:2-33:9 (Juarez, Vigil); id. at 86:11-17 (Torrez,

Ortega); Vigil Report at 1; Probable Cause at 1; Ortega Report at 1.[7]

17.     As Reyes-Vencomo was exiting the truck, Vigil noticed a large machete in the vehicle's cab and informed Reyes-Vencomo that he would be temporarily detained outside of the vehicle for officer safety.  See Tr. at 21:6-18 (Torrez, Vigil); id. at 39:20-40:4 (Juarez, Vigil); id. at 58:14 (Torrez, Holfelder); Vigil Report at 1; Probable Cause at 1; Ortega Report at 1.

18.     Vigil was attempting to escort Reyes-Vencomo to his police vehicle when Reyes-Vencomo's cellular telephone began to ring.  See Tr. at 22:3-12 (Torrez, Vigil); id. at 86:24-87:6 (Torrez, Ortega); Vigil Report at 1; Probable Cause at 1; Ortega Report at 1.

19.     For officer safety, Vigil instructed Reyes-Vencomo not to reach into his pockets, but Reyes-Vencomo ignored the order and attempted to retrieve the telephone from his pocket.  See Tr. at 22:8-23:3 (Torrez, Vigil); id. at 74:11-17 (Torrez, Reyes-Vencomo); id. at 87:12-20 (Torrez, Ortega); Vigil Report at 1; Probable Cause at 1; Ortega Report at 1.[8]

---

[7]Reyes-Vencomo testified that Ortega asked him to exit his vehicle.  See Tr. at 72:7-15 (Torrez, Reyes-Vencomo).  Vigil and Ortega testified, and their reports noted, that Reyes-Vencomo exited his vehicle without prompting.  See Tr. at 20:21-23 (Torrez, Vigil); id. at 33:2-33:9 (Juarez, Vigil); id. at 86:11-17 (Torrez, Ortega); Vigil Report at 1; Probable Cause at 1; Ortega Report at 1.  Ortega was a trainee conducting his first traffic stop, see Tr. at 14:13-19 (Torrez, Vigil), and the Court believes it unlikely that he would almost immediately ask Reyes-Vencomo to step out of the vehicle.  Furthermore, Reyes-Vencomo was very agitated, animated, and at times inconsistent on the stand.  In contrast, the officers' calmly presented testimony, which was both internally consistent and consistent with each other's testimony.  Accordingly, the Court credits the officers's testimony and finds that Reyes-Vencomo exited his vehicle without prompting.

[8]Reyes-Vencomo testified that, before his telephone started ringing, Vigil tackled him and started beating him.  See Tr. at 73:1-6 (Torrez, Reyes-Vencomo).  Vigil did not mention such an incident in his testimony, and, when asked, Ortega testified that there was no altercation or tackling before Reyes-Vencomo's telephone began to ring.  See Tr. at 87:7-11 (Torrez, Ortega).  Reyes-Vencomo's testimony presents an improbable scenario, because he suggests that, out of nowhere, Vigil tackled him to the ground and began to beat him.  It does not make sense to the Court that an officer would jeopardize his safety and escalate an encounter by tackling a driver, who had been compliant up until that point.  Furthermore, both officers admit that there was an altercation that took place during the arrest; it is unlikely that they would mention one altercation, but not the other.

20.     In response to Reyes-Vencomo's attempt to put his hands in his pockets, Vigil tried to physically restrain Reyes-Vencomo, and both Vigil and Reyes-Vencomo fell to the ground.  See Tr. at 23:4-12 (Torrez, Vigil); id. at 87:16-22 (Torrez, Ortega); Vigil Report at 1; Probable Cause at 1; Ortega Report at 1.

21.     Reyes-Vencomo's telephone and wallet fell out of his pocket, and remained on the ground while Vigil attempted to gain control of Reyes-Vencomo.  See Tr. at 23:14-25 (Torrez, Vigil);Vigil Report at 1; Probable Cause at 1; Ortega Report at 1.

22.     The Social Security card, which Vigil had retained, also fell to the ground.  See Tr. at 23:14-20 (Torrez, Vigil); Vigil Report at 1; Probable Cause at 1; Ortega Report at 1.

23.     Reyes-Vencomo's wife, Shirley Reyes, then arrived on the scene and, contrary to Vigil's directions, picked up Reyes-Vencomo's suspect Social Security card, tore it into pieces, and stuffed them into her shirt and mouth.  See Tr. at 24:12-25:3 (Torrez, Vigil); id. at 75:15-18 (Torrez, Reyes-Vencomo); id. at 88:25-89:14 (Torrez, Ortega); Vigil Report at 1; Probable Cause at 1; Ortega Report at 1.

24.     Vigil had previously met S. Reyes, but had not previously met Reyes-Vencomo.  See Tr. at 36:6-17 (Juarez, Vigil).[9]

_____

Reyes-Vencomo  also does not discuss this alleged altercation in his Motion to Suppress or his Reply.  For these reasons, the Court does not credit Reyes-Vencomo's testimony, which appears to have been the first time that he mentioned this initial altercation.

   [9]During argument on the Motion to Suppress and in the Reply, Reyes-Vencomo's counsel, Santiago Juarez, suggested that Vigil knew who he was arresting.  See Tr. at 99:1-6 (Juarez); Reply at 3-4.  Vigil stated that he met Reyes-Vencomo that day and that he does not remember meeting him before.  See Tr. at 36:6-17 (Juarez, Vigil).  Additionally, Ortega testified that Vigil never indicated that he knew who Reyes-Vencomo was.  See Tr. at 83:5-9 (Torrez, Ortega).  There is insufficient evidence for the Court to find, by a preponderance of the evidence, that Vigil knew that the man he was arresting was married to S. Reyes before S. Reyes arrived at the scene.  Accordingly, the Court will not find, by a preponderance of the evidence, that Vigil was aware of whom Reyes-

25.     Simultaneously, Reyes-Vencomo continued to resist Vigil's attempt to restrain him and head-butted Vigil in the nose as he was attempting to place Reyes-Vencomo in the back of the police unit.  See Tr. at 25:4-19 (Torrez, Vigil); id. at 89:23-90:10 (Torrez, Ortega); Vigil Report at 1; Probable Cause at 1; Ortega Report at 1.

26.     While awaiting backup, the officers placed Reyes-Vencomo and his wife under arrest. See Tr. at 26:9-27:12 (Torrez, Vigil); id. at 90:11-18 (Torrez, Ortega).

27.     Reyes-Vencomo and S. Reyes were both placed in police vehicles.  See Tr. at 90:15-22 (Torrez, Ortega).

28.     Vigil issued citations to Reyes-Vencomo for: (i) driving without a driver's license, under N.M.S.A. 1978, § 66-5-2; (ii) failing to come to a complete stop, under N.M.S.A. 1978, § 66-8-116; and (iii) and driving forty miles per hour in a twenty-five miles-per-hour zone, under N.M.S.A. 1978, § 66-7-301.  See Tr. at 27:20-28:10 (Torrez, Vigil); Stop Sign Citation at 1; Speeding Citation at 1; License Citation at 1.

29.     Vigil advised the other officers at the scene that a tow truck should be called.  See Tr. at 43:9-10 (Torrez, Vigil).

30.     Taos Police Department Policy provides:

1.      When the operator of a vehicle is arrested and there is no one immediately available whom they want to take charge of the vehicle, it will be towed. This decision shall be noted in the narrative of the report, which is completed.

2.      In the event the vehicle is towed, the adopted procedures for tow rotation will be followed.

3.      A vehicle inventory will be completed and attached to any associated reports. If there is an Offense/Incident report completed, place the case number on

_____

Vencomo was before S. Reyes arrived at the scene.

the top right corner of the inventory.

Taos Police Department Towing Policy at 4-5 (Govt's Ex. 5 at hearing).

31.     Pursuant to standard police procedure, Taos Police Department officers conducted a search of Reyes-Vencomo's vehicle before towing and inventoried the items in the vehicle.  See Tr. at 53:24-56:7 (Torrez, Holfelder); Taos Police Department Towing Policy at 5; Taos Police Department Towing Authorization and Inventory at 1(Govt's Ex. 4 at hearing)("Inventory").[10]

32.     When Detective Barry Holfelder, the officer who conducted the search of Reyes-Vencomo's vehicle, arrived, the only individuals at the scene were two sheriff's deputies, five Taos police officers, and Reyes-Vencomo, who was in the back of a police vehicle.  See Tr. at 63:2-14 (Juarez, Holfelder); id. at 55:8-19 (Torrez, Holfelder).[11]

33.     Holfelder arrived at the scene between 12:30 p.m. and 12:35 p.m., and the traffic stop took place "quite awhile" before he arrived.  Tr. at 50:22-23 (Torrez, Holfelder).

34.     Holfelder understood the "immediately available" requirement in the Taos Police Department Towing Policy to refer to another vehicle occupant or an individual traveling in tandem with the stopped vehicle.  See Tr. at 55:16-23 (Torrez, Holfelder).

35.     The purpose of the Taos Police Department Towing Policy is to remove the vehicle

---

[10]Holfelder testified that, when he arrived at the scene, he spoke to his partner, who was at the door of S. Reyes' vehicle.  See Tr. at 51:7-9 (Torrez, Holfelder).  There was, however, no testimony whether S. Reyes' vehicle was also towed and searched.  Accordingly, the Court finds only that Reyes-Vencomo's vehicle was searched and inventoried.

[11]None of the witnesses testified whether S. Reyes was still at the scene when Holfelder arrived and neither the United States nor Reyes-Vencomo argued that she was still at the scene.  Accordingly, the Court cannot determine whether S. Reyes remained at the scene while Holfelder searched Reyes-Vencomo's vehicle.  This fact is not material, however, because, even if she remained at the scene, she too was under arrest and was placed in the back of a police car.  See Tr. at 25:4-9 (Torrez, Vigil); id. at 90:15-22 (Torrez, Ortega).  She was thus not immediately available to take Reyes-Vencomo's vehicle.

from the roadway, to inventory the items within the vehicle to protect the Taos Police Department and the Town of Taos, and to provide a document noting what the vehicle held at the time that it was towed.  See Tr. at 53:24-54:10 (Torrez, Holfelder).

36.     The Taos Police Department Towing Policy is a uniform standardized policy to do a complete inventory search of a vehicle when a vehicle will be towed, because the owner is under arrest and no one is immediately available to take possession of the vehicle.  See Tr. at 53:24-54:10 (Torrez, Holfelder); Taos Police Department Towing Policy at 4-5.

37.     Holfelder noticed that a young woman, whom he believes was Reyes-Vencomo's stepdaughter, arrived some point after he began his inventory search.  See Tr. at 63:17-18 (Juarez, Holfelder); id. at 65:25-11 (Torrez, Holfelder).[12]

38.     Holfelder testified that he saw Gutierrez having a conversation with Vigil through the driver's door of Reyes-Vencomo's vehicle.  See Tr. at 66:3-11 (Torrez, Holfelder)

---

[12]Reyes-Vencomo testified that his stepdaughter arrived at the scene at the same time as his wife.  See Tr. at 75:15-23 (Torrez, Reyes-Vencomo); id. at 77:8-16 (Torrez, Reyes-Vencomo). Holfelder testified that a woman, whom he believes to be Reyes-Vencomo's stepdaughter, Gutierrez, arrived on the scene after he began his search.  See Tr. at 63:17-18 (Juarez, Holfelder); id. at 65:25-11 (Torrez, Holfelder).  Reyes-Vencomo's testimony places Gutierrez on the scene at the time he was involved in the altercation with Vigil and when S. Reyes was arrested.  None of the officers' reports or testimony, however, mention  Gutierrez' presence at the scene.  See Vigil Report at 1; Ortega Report at 1.  Ortega testified that he does not recall ever seeing Gutierrez at the scene. See Tr. at 94:21-22 (Juarez, Ortega).  If Gutierrez was at the scene when the altercation was going on or immediately thereafter, it seems unlikely that the officers would not note or have been aware of her presence.  Given the reactions of Reyes-Vencomo and S. Reyes, it seems unlikely that the officers would not have taken notice of her at that point out of fear for their safety.  The Court again notes that, during their testimony, the officers were calm and their statements consistent, both internally and with each other.  In contrast, Reyes-Vencomo was much more animated on the witness stand, his statements were not always internally consistent, and some of his factual assertions, such as stating that Ortega never asked for a driver's license, were improbable.  Based on the Court's careful observation of the testimony and review of the evidence submitted, the Court found the officers' statements more credible than Reyes-Vencomo on this issue.  Accordingly, the Court finds that Gutierrez arrived after Holfelder began his search.

39.     At some point after the tow truck had been called, Betty Gonzales and Claudia Gutierrez, S. Reyes' daughter, asked Vigil whether they could drive Reyes-Vencomo's truck home. See Tr. at 43:16-44:7 (Juarez, Vigil).

40.     Vigil left the scene, because paramedics advised that he proceed to the hospital for X-rays. See Tr. at 30:8-11 (Torrez, Vigil); Vigil Report at 1-2; Probable Cause at 1-2.

41.     Holfelder was not aware that anyone had offered to drive the vehicle to Reyes-Vencomo's home. See Tr. at 51:14-18 (Torrez, Holfelder).

42.     After his arrest, Reyes-Vencomo was placed in the back of a locked police car, with the windows rolled up, and made no contact with anyone at the scene. See Tr. at 55:2-57:4 (Torrez, Holfelder); id. at 90:15-91:3 (Torrez, Ortega).[13]

43.     Holfelder and Ortega found and inventoried two boxes of ammunition and two handguns. See Tr. at 58:4-60:2 (Torrez, Holfelder).

44.     Reyes-Vencomo is a citizen of Mexico and is unlawfully present in the United States. See Tr. at 78:6-10 (Torrez, Reyes-Vencomo).

45.     Vigil and Ortega prepared narrative summaries of their encounter with Reyes-Vencomo, but did not note the decision to tow. See Tr. at 32:16-18 (Juarez, Vigil); id. at 64:22-65:4

_____

[13]Reyes-Vencomo testified that he asked an officer if his wife, S. Reyes, or stepdaughter, Gutierrez, could take his vehicle home before he was placed in the back of the police car. See Tr. at 69:23-70:1 (Juarez, Reyes-Vencomo). Reyes-Vencomo did not state whom the officer was or what the officer's reaction to his request was. The Court has already found that Gutierrez was not at the scene before Holfelder arrived, and Holfelder testified that Reyes-Vencomo was in the back of the police car when he arrived. See Tr. at 56:8-19 (Torrez, Holfelder). Ortega also testified that he did not see Reyes-Vencomo contact anyone about having his wife or stepdaughter take his car. See Tr. at 90:15-91:3 (Torrez, Ortega). Vigil, who admitted that Gutierrez and Gonzales asked to take the vehicle, see Tr. at 43:16-44:7 (Juarez, Vigil), did not mention that Reyes-Vencomo asked him or anyone else to allow someone else to take the vehicle. The Court finds that the officers' testimony is more credible in this respect and that Reyes-Vencomo made no contact with anyone at the scene to request that Gutierrez or S. Reyes take his vehicle home.

(Juarez, Holfelder); id. at 91:20-22 (Juarez, Ortega); Vigil Report at 1; Ortega Report at 1.

## PROCEDURAL BACKGROUND

On September 27, 2011, a federal grand jury in the District of New Mexico returned an indictment against Reyes-Vencomo, charging him with being an Alien in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(5)(A) and 924(a)(2). See Doc. 16. On October 6, 2011, Reyes-Vencomo appeared for arraignment and entered a not guilty plea. See Magistrate Clerk's Minutes of Arraignment at 1, filed October 6, 2011 (Doc. 21).

On November 30, 2011, Reyes-Vencomo filed a motion to suppress certain evidence, specifically the firearms and ammunition he is accused of possessing and any statements he made to law enforcement officers. See Motion to Suppress at 1. Reyes-Vencomo moves the Court to suppress all evidence recovered from his motor vehicle and all post-arrest statements that he made to law enforcement in connection with and as a result of his arrest on August 9, 2011. See Motion to Suppress at 1. He asserts that he was unconstitutionally detained after Vigil and Ortega pulled him over for running a stop sign. See Motion to Suppress at 3. Reyes-Vencomo asserts that, under Terry v. Ohio, 392 U.S. 1 (1968), the Court must determine: (i) whether the traffic stop was justified and supported by a reasonable suspicion; and (ii) whether the officers' actions during the detention were reasonably related in scope to the circumstances which justified the stop. See Motion to Suppress at 3 (citing United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997)). Reyes-Vencomo represents that the officers in this case have stated that they executed a traffic stop of Reyes-Vencomo because they observed him going through a stop sign without coming to a full stop. See Motion to Suppress at 4. He contends that, when the investigation of a traffic offense is complete, a driver must be allowed to proceed without further delay or additional questioning, unless an officer acquires an objectively reasonable and articulable suspicion of illegal activity. See

Motion to Suppress at 5.  Reyes-Vencomo asserts that the officers here had no such suspicion and that his continued detention violated his constitutional rights.  See Motion to Suppress at 5.

Reyes-Vencomo argues that his involuntary detention never ceased, because Vigil never concluded the investigation of the traffic offense despite the lack of reasonable, articulable suspicion of criminal activity.  See Motion to Suppress at 6.  He asserts that he had already provided sufficient identification, and that Vigil had no right to request his Social Security number or card.  See Motion to Suppress at 6-7.  Reyes-Vencomo further contends that the officers' questions exceeded the scope of a lawful stop under New Mexico and federal law.  See Motion to Suppress at 7.  He argues that Vigil and Ortega were bound by New Mexico law as Taos police officers making a stop in New Mexico, and that he is entitled to the protections of New Mexico law.  See Motion to Suppress at 7.  He asserts that the Court should honor his protections against unreasonable searches and seizures as established under New Mexico law.  See Motion to Suppress at 8.

On December 19, 2011, Plaintiff United States of America timely filed, pursuant to rule 45(c) of Federal Rules of Criminal Procedure and rule 5(b)(2)(E) of the Federal Rules of Criminal Procedure, its Response to Defendant's Motion to Suppress (Doc. 40)("Response").  The United States characterizes Reyes-Vencomo's Motion to Suppress as advancing two arguments: (i) that his continued detention after providing officers with his vehicle registration and proof of insurance constituted an unlawful seizure under the Fourth Amendment; and (ii) that Vigil's request for Reyes-Vencomo's Social Security number exceeded the lawful scope of the traffic stop.  See Response at 4.

The United States argues that the traffic stop, detention, and arrest of Reyes-Vencomo was based on reasonable suspicion and probable cause that he was engaged in criminal activity.  See Response at 4.  The United States asserts that the initial traffic stop was based on an observed traffic violation, because Reyes-Vencomo failed to come to a complete stop at a stop sign.  See Response

-14-

at 5.  It contends that the continued Reyes-Vencomo's detention was based on probable cause that he was driving without a valid driver's license.  See Response at 5.  The United States argues that requesting identification and running a check for warrants is lawful under such circumstances. See Response at 5.  The United States asserts that Reyes-Vencomo had no driver's license and was driving the vehicle in violation of N.M.S.A. 1978, § 66-5-2.  See Response at 5.  It argues that Vigil had probable cause to arrest Reyes-Vencomo and that an officer may arrest a defendant for a misdemeanor if a crime occurs in the officer's presence.  See Response at 5.  The United States asserts that New Mexico law requires persons to identify themselves when a law enforcement officer asks them to do so.  See Response at 6 (citing N.M.S.A. 1978, § 30-22-3).  It argues that Vigil asked Reyes-Vencomo for his Social Security number, because Reyes-Vencomo had indicated he had no other form of identification and that Vigil was trying to determine, consistent with state law, who Reyes-Vencomo was.  See Response at 6.  The United States contends that Vigil had a reasonable suspicion that Reyes-Vencomo was concealing his identity in violation of N.M.S.A. 1978, § 30-2-3, which provides that:

> Concealing identity consists of concealing one's true name or identity, or disguising oneself with intent to obstruct the due execution of the law or with intent to intimidate, hinder or interrupt any public officer or any other person in a legal performance of his duty or the exercise of his rights under the laws of the United States or this state.

> Whoever commits concealing identity is guilty of a petty misdemeanor.

Response at 6-7 (quoting N.M.S.A. 1978, § 30-2-3).  It asserts that an officer may question a detainee during a stop to dispel or confirm his or her suspicions and that, through his questioning, Vigil was able to confirm his suspicions about Reyes-Vencomo's identity.  See Response at 7.  It argues that, when Reyes-Vencomo failed to produce a valid identifying document, Vigil had reasonable suspicion that Reyes-Vencomo might not be who he stated he was.  See Response at 7.

-15-

The United States further asserts that, when dispatch informed Vigil that there was no record of the Social Security number Reyes-Vencomo gave, Vigil had probable cause to believe that Reyes-Vencomo was concealing his identity.  See Response at 7.

With respect to the inventory search, the United States asserts that a law enforcement agency may conduct an inventory search of an automobile to protect the owner's property while it remains in police custody.  See Response at 8.  The United States represents that, to fit within the inventory exception to the warrant requirement, a search must: (i) be conducted in accordance with standard criteria ensuring that the inventory process is not used as a subterfuge; and (ii) it is conducted on the basis of something other than suspicion of criminal activity.  See Response at 8 (citing Dakota v. Opperman, 428 U.S. 364, 369 (1976)).  It argues that impoundment is reasonable when the driver of a vehicle cannot lawfully operate it and there is no third person who can immediately take custody of the car.  See Response at 9 (citing United States v. Haro Salcedo, 107 F.3d 769, 771 (10th Cir. 1997)).  The United States contends that, because Reyes-Vencomo and his wife were under arrest, the officers' caretaking responsibilities justified impoundment of Reyes-Vencomo's vehicle. See Response at 9.  It asserts that the inventory search was conducted in conformity with a standardized procedure and was not a "general rummaging for evidence."  Response at 9.

Finally, the United States argues that the Fourth Amendment permits officers to make a protective search of a vehicle which may contain a weapon.  See Response at 9.  The United States asserts that the machete, which Vigil observed inside the vehicle, constituted probable cause to believe that the vehicle contained weapons.  See Response at 10.  It argues that a protective sweep of the vehicle was thus permissible under the Fourth Amendment.  See Response at 10.

On January 2, 2012, Reyes-Vencomo filed his Reply to Memorandum Brief in Opposition to Motion to Suppress Evidence Recovered from the Defendants' [sic] Vehicle and Post-Arrest

Statements of the Defendant.  See Doc. 41 ("Reply").  Reyes-Vencomo asserts that the officers could only detain and release him pursuant to N.M.S.A. 1978, §§ 66-8-122 and 66-8-123 for the traffic infraction or for driving without a license.  See Reply at 3.  Reyes-Vencomo cites State v. Bricker, 139 N.M. 513, 134 P.3d 800 (Ct. App. 2006), which he asserts clarifies the interplay between those statutes and the ability of an officer to arrest based upon those statutes.  See Reply at 3.  He also argues that the officers never stated that they were concerned whether Reyes-Vencomo was concealing his true identity and that their concern was with the Social Security card.  See Reply at 3.  Reyes-Vencomo further asserts that the officers did not cite him for concealing his identity. See Reply at 4.

With respect to the search, Reyes-Vencomo asserts that the inventory search violated his rights, because the officers had no occasion to arrest him in the first place and, therefore, no basis to impound his vehicles.  See Reply at 4.  He also contends that, at the time the search was conducted, he was restrained and in the back of a police unit.  See Reply at 4.  Reyes-Vencomo asserts that, because he no longer presented a danger, the protective search was invalid under Arizona v. Gant, 556 U.S. 332 (2009).  See Reply at 5.

The Court held an evidentiary hearing on January 27, 2012.  In opening remarks, Reyes-Vencomo asserted that it is the United States' burden to show that the warrantless search did not violate the Fourth Amendment.  See Tr. at 4:7-11 (Juarez).  Reyes-Vencomo stated that he does not contest that the initial stop was valid.  See Tr. at 4:13-15 (Juarez).  Reyes-Vencomo suggested that, the moment Vigil asked Reyes-Vencomo for his Social Security information, he ventured into the realm of trying to enforce federal immigration law, which he has no jurisdiction to enforce.  See Tr. at 4:21-5:2 (Juarez).  Reyes-Vencomo argued that, whether Vigil asked for his Social Security number or card, both are beyond the scope of the traffic stop.  See Tr. at 5:3-7 (Juarez).  Reyes-

Vencomo further asserted that there was not a valid investigatory search.  See Tr. at 5:20-23

(Juarez).  He represented that this case presents a novel question of law that should be certified to

the United States Court of Appeals for the Tenth Circuit: that when the United States relies on an

administrative search,[14] all the laws of the state, including laws relating to arrest, should apply to that

search because there is an administrative purpose and the search does not rely on the Fourth

Amendment.  See Tr. at 6:7-14 (Juarez).[15]

      In its opening remarks, the United States asserted that it would not address whether Reyes-

Vencomo has presented a novel question of law, because that question was not raised in the briefing.

See Tr. at 6:19-22 (Torrez).  The United States argued that this case involves a "run-of-the-mill"

traffic stop and that, when Reyes-Vencomo indicated that he did not have a driver's license, the

officers had a reasonable, articulable suspicion of criminal activity under N.M.S.A. 1978, § 66-5-16.

---

[14]Courts sometimes refer to an inventory search as an "administrative search."  United States v. Allen, 43 F.App'x 363, 364-65 (10th Cir. 2002)(unpublished)("Where the police lawfully impound particular property, the police are entitled to perform an administrative search of the property in order to inventory the contents of that property."); United States v. Thomas, 73 F.App'x 365, 368 (10th Cir. 2003)(noting that "[t]he Supreme Court has held that police are entitled to conduct an administrative search of a vehicle in order to secure and inventory its contents when the vehicle has been lawfully impounded or taken into police custody").

[15]Reyes-Vencomo has not briefed the "novel question of law" which he believes should be certified to the Tenth Circuit.  The Court does not believe that he has clearly presented the issue of law that he wishes to be decided.  The Tenth Circuit has held that "'the exclusionary rule is only concerned with deterring [federal] Constitutional violations.'"  United States v. Le, 173 F.3d 1258, 1265 (10th Cir. 1999)(alteration original)(quoting United States v. Wright, 16 F.3d 1429, 1437 (6th Cir. 1994)).  Therefore, "the fact that the arrest, search, or seizure may have violated state law is irrelevant so long as the standards developed under the Federal Constitution were not offended."  United States v. Le, 173 F.3d at 1265 (alterations omitted).  The Court is unsure for what Reyes-Vencomo is asking when he requests that the Court "certify" this question to the Tenth Circuit.  If Reyes-Vencomo wishes to file an interlocutory appeal, then the proper procedure is for the district court to first decide the question.  See United States v. Wittig, 575 F.3d 1085, 1095 (10th Cir. 2009)(noting that, when the district court denied the defendants' motion to suppress, the defendants filed an interlocutory appeal).

See Tr. at 7:3-6 (Torrez).  The United States represented that the Court addressed a similar issue in United States v. Jacquez, 409 F.Supp.2d 1286 (D.N.M. 2005)(Browning, J.).  See Tr. at 7:7-9 (Torrez).  It argued that, when a driver is stopped for a traffic violation and indicates that he is without a driver's license, that alone gives an officer reasonable, articulable suspicion and authorizes further investigation.  See Tr. at 7:9-16 (Torrez).  The Court then heard testimony from Vigil, Holfelder, Reyes-Vencomo, and Ortega.

Reyes-Vencomo argued that this case is about a Social Security card.  See Tr. at 98:8-11 (Juarez).  He asserted that the testimony is clear that there was a traffic stop and that, when asked for his Social Security information, he produced one.  See Tr. at 98:11-25 (Juarez).  He contended that the traffic stop then went awry, but that all of the documents surrounding the truck are legitimate.  See Tr. at 99:1-2 (Juarez).  Reyes-Vencomo asserted that Vigil has consistently testified that the only reason he detained Reyes-Vencomo was to further investigate the Social Security information.  See Tr. at 99:15-18 (Juarez).  He argued that, at that moment, Vigil exceeded the scope of the stop, violating his rights, and illegally detaining him from that moment onward.  See Tr. at 99:23-100:1 (Juarez).  Reyes-Vencomo contended that he could not be arrested for driving without a licenses and cited Atwater v. City of Lago Vista, 532 U.S. 318 (2001), for support.  See Tr. at 100:2-5 (Juarez).  He represented that the Supreme Court of the United States, in Atwater v. City of Lago Vista, held that, if a crime has been committed, even if it is a misdemeanor offense, an officer may validly arrest an individual under the Fourth Amendment.  See Tr. at 100:10-14 (Juarez).  Reyes-Vencomo argued that, under N.M.S.A. 1978, § 66-5-16, driving without a license is not a criminal offense and, thus, is not a violation for which he can be arrested.  See Tr. at 100:15-20 (Juarez).  He also asserted that using a false Social Security card as identification during a traffic stop is not a crime, or at least not one for which that Vigil could arrest him.  See Tr. at 100:22-101:4

-19-

(Juarez).  Reyes-Vencomo also argued that his resistance of an unlawful arrest could not provide the officers with a separate basis to arrest him.  See Tr. at 101:4-15 (Juarez).

With respect to the inventory search, Reyes-Vencomo asserted that two people were immediately available to drive the truck back to his house and that Vigil admitted this fact.  See Tr. at 101:19-21 (Juarez).  He argued that Vigil knew Gonzales and Gutierrez.  See Tr. at 101:22-102:3 (Juarez).  Reyes-Vencomo additionally argued that both women asked Vigil whether they could drive the truck home, such that, under the Taos Police Department policy, someone was immediately available to take the vehicle.  See Tr. at 102:5-9 (Juarez).  Reyes-Vencomo asserted that the only way to establish whether someone is immediately available to take the vehicle is to ask, and Holfelder had no contact with him.  See Tr. at 102:10-103:1 (Juarez). Moreover, Reyes-Vencomo contended that no officer noted in their report that no one was available to take the vehicle as required under the Taos policy.  See Tr. at 103:1-7 (Juarez).  Reyes-Vencomo argued that, even if the Court finds that the arrest was valid, the Court should grant the Motion to Suppress, because of the failure to follow the proper inventory-search procedure.  See Tr. at 103:8-14 (Juarez).

The Court asked Reyes-Vencomo whether it would need to make a credibility determination to resolve the issues before it.  See Tr. at 103:20-24 (Court).  Reyes-Vencomo responded that he did not believe that the Court would need to make a credibility determination with respect to the inventory search question, because Vigil admitted that he recognized Gutierrez as S. Reyes' daughter and that she asked to take the vehicle home.  See Tr. at 104:1-7 (Juarez).

The United States represented that the Court needs to answer four questions: (i) whether an officer may detain a driver following a failure to produce a driver's license; (ii) whether an officer may ask a driver for a Social Security number in the absence of a driver's license; (iii) whether an officer may detain a defendant for officer safety in the presence of a knife or weapon; and (iv)

whether, following a lawful arrest, law enforcement officers may conduct an inventory search of the defendant's vehicle before having it towed.  See Tr. at 104:17-105:4 (Torrez).

The United States contended that the Court addressed the first question in United States v. Jacquez.  See Tr. at 105:5-9 (Torrez).  It asserted that the Court found that an officer could lawfully detain an individual driving without a license based on that violation.  See Tr. at 105:24-106:4 (Torrez).  The United States submitted that it did not need to go beyond the Court's ruling in that case on the question of detention.  See Tr. at 106:5-7 (Torrez).  The United States further asserted that the Tenth Circuit precedent, established in United States v. Galindo-Gonzales, 142 F.3d 1217 (10th Cir. 1998), and United States v. Zubia-Melendez, 263 F.3d 1155, 1161 (10th Cir. 2001), supports the Court's decision in United States v. Jacquez.  See Tr. at 106:7-11 (Torrez).  The Court asked for the United States' response to Reyes-Vencomo's argument that NMSA 1978, § 66-5-16 does not have an enforcement provision.  See Tr. at 106:12-14 (Court).  The United States responded that there are two provisions in the vehicle code which reference unlicensed drivers, but noted that another provision in the New Mexico traffic code states that violations that are not otherwise penalized are considered misdemeanors.  See Tr. at 106:23-107:1 (Torrez)(citing N.M.S.A. 1978, § 66-8-7).  It asserted that Reyes-Vencomo has cited State v. Bricker, in which the Court of Appeals of New Mexico reached important conclusions about the interplay between the Constitution of the United States and the New Mexico Constitution.  See Tr. at 107:2-8 (Torrez).  The United States represented that State v. Bricker excluded evidence where an unlawful arrest took place under Article II, section 10 of the New Mexico Constitution, but noted that the Court of Appeals of New Mexico specifically found that the same analysis would not apply under the Fourth Amendment. See Tr. at 107:9-13 (Torrez).  The United States asserted that, in State v. Slayton, 147 N.M. 340, 223 P.3d 337 (2009), the Supreme Court of New Mexico found that, under the Fourth Amendment, the

constitutional reasonableness of a custodial arrest is measured by whether probable cause existed for the arrest and cited Virginia v. Moore, 553 U.S. 164 (2008),  for the proposition that an arrest is lawful, under the Constitution of the United States, when the officer has probable cause to believe than an individual has committed even a minor crime in his presence.  See Tr. at 107:13-108:2 (Torrez).  The United States further asserted that, in Virginia v. Moore, Justice Scalia, speaking for the Court, held that police officers did not violate the Fourth Amendment when they arrested a motorist they believed to be violating Virginia law, even though, under Virginia law, the motorist would have ordinarily been issued a summons rather than arrested.  See Tr. at 108:3-12 (Torrez). It argued that, under the Fourth Amendment and Virginia v. Moore, it makes no difference that, under New Mexico law, the officer should have written a citation, rather than arrested Reyes-Vencomo, for driving without a license.  See Tr. at 108:13-22 (Torrez).

The United States contended that driving without a license is a misdemeanor and that Vigil could have arrested Reyes-Vencomo for that offense, without violating the Fourth Amendment, when Reyes-Vencomo stated that he did not have a license.  See Tr. at 108:23-109:2 (Torrez).  It argued that Vigil asked Reyes-Vencomo for his Social Security number to try to confirm his identity.  See Tr. at 109:3-7 (Torrez).  The United States asserted that, when Reyes-Vencomo gave Vigil a false Social Security card, the officers had reasonable suspicion of criminal activity, that being a violation of N.M.S.A. 1978, § 30-22-3, concealing identity from an officer.  See Tr. at 109:7-11 (Torrez).  It represented that State v. Andrew, 123 N.M. 95, 934 P.2d 289 (Ct. App. 1997), is instructive, because there the Court of Appeals of New Mexico stated that name is synonymous with identity and details that, when officers are unable to obtain a valid driver's license, they could for a date of birth as well as Social Security number.  See Tr. at 109:19-22 (Torrez).  The United States asserted that State v. Andrew held that failure to provide information contained in a driver's

license falls within the scope of the concealing identity statute.  See Tr. at 109:23-110:3 (Torrez).
It argued that State v. Andrew related to the Supreme Court's decision in United States v. Brignoni-Ponce, 422 U.S. 873 (1975), which establishes that an officer may question and detain an individual to confirm or dispel his suspicions.  See Tr. at 110:4-7 (Torrez).  The United States contended that Vigil was within his rights to investigate two offenses: (i) driving without a license; and (ii) an inability to verify identity.  See Tr. at 110:8-12 (Torrez).  The United States argued that the encounter then escalated, because of Reyes-Vencomo's behavior, and that Reyes-Vencomo's credibility is something that the Court should closely scrutinize.  See Tr. at 110:13-111:4 (Torrez)

The Court noted that the United States was not arguing that this encounter was consensual. See Tr. at 111:7-8 (Court).  The United States agreed that it was not making that argument.  See Tr. at 111:9 (Torrez).  The Court then asked the United States at what point it believes an arrest occurred.  See Tr. at 111:10-11 (Court).  The United States responded that Reyes-Vencomo was detained, but not arrested, up until the moment his cellular telephone began ringing, when Vigil issued the order not to answer the cellular telephone, and when Reyes-Vencomo began to resist. See Tr. at 111:12-21 (Torrez).  The Court asked whether the United States was asserting that the encounter was still an investigative stop when Vigil began taking him to the police vehicle.  See Tr. at 111:22-24 (Court).  The United States asserted that it was an investigative stop and a detention, but not a "full-blown" arrest, until Vigil issued the order and Reyes-Vencomo resisted the order. Tr. at 111:24-112:7 (Torrez).  The Court asked for what offense Vigil had probable cause to arrest Reyes-Vencomo at that point.  See Tr. at 112:8-9 (Court).  The United States responded that the officers had probable cause to arrest him for resisting arrest because he disobeyed a lawful command given for officer safety.  See Tr. at 112:10-19 (Torrez).  The United States asserted that the officers did not know for what Reyes-Vencomo was reaching in his pocket.  See Tr. at 112:19 (Torrez).  The

United States suggested that the Court should decline Reyes-Vencomo's invitation to hold that he had a right to resist the arrest, because it was an unlawful arrest.  See Tr. at 113:13-19 (Torrez).  It argued that Reyes-Vencomo does not have that right; his right is to appear before a court to redress that violation.  See Tr. at 113:19-114:2 (Torrez).

With respect to the second question, the United States asserted that it was unable to find, either in Reyes-Vencomo's briefings or in its own research, any federal or state statute that prohibits a law enforcement officer from requesting a Social Security number or card.  See Tr. at 114:5-11 (Torrez).  The United States argued that the closest case that Vencomo-Reyes cites in his briefing is People v. Farley, 20 Cal. App.3d 1032 (1971), which states that a Social Security card is not for identification, because it contains no description or information concerning the holder.  See Tr. at 114:13-18 (Torrez).  The United States pointed the Court to State v. Chapman, 127 N.M. 721, 986 P.2d 1122 (Ct. App. 1999), which holds that an officer may investigate matters unrelated to the stop if the officer has reasonable suspicion.  See Tr. at 114:21-115:4 (Torrez).  It asserted that, when Reyes-Vencomo indicated that he did not have a driver's license, the officers had independent evidence to support his continued detention.  See Tr. at 115:9-15 (Torrez).

The United States then moved to the next two questions it posed.  The United States asserted that an officer has the right to detain a driver for officer safety when in the presence of a weapon, when the driver is agitated, and when the driver is unable to identify himself.  See Tr. at 115:16-19 (Torrez).  The United States contended that Reyes-Vencomo has cited no authority establishing that an officer could not detain a driver in those circumstances.  See Tr. at 115:19-116:2 (Torrez).  With respect to the inventory search, the United States argued that an inventory search must be conducted in accordance with standard criteria and for a purposes other than investigation of criminal activity.  See Tr. at 116:4-9 (Torrez).  The United States asserted that Reyes-Vencomo never told the officers

that he wished for Gutierrez or Gonzales to take his vehicle to his home.  See Tr. at 116:16-117:5 (Torrez).  It argued that the officers should not have to wait to see who might show up to take possession of an arrested individual's vehicle.  See Tr. at 117:21-118:1 (Torrez).  The United States asserted that Gutierrez and Gonzales showed up at some point, but that the tow truck had already been called and, if the inventory was already underway, then the bell had already rung, because the officers had found the weapons.  See Tr. at 118:1-6 (Torrez).  It contended that the officers acted in good faith, because, when they began the inventory search, no person was immediately available at the scene.  See Tr. at 118:7-13 (Torrez).  The United States asserted that the officers were under no obligation to wait to see if anyone would become available and that the inventory search was conducted according to policy.  See Tr. at 118:14-25 (Torrez).

Reyes-Vencomo reiterated that it is the United States' burden to establish that the defendant's rights were not violated.  See Tr. at 119:11-12 (Juarez).  He emphasized that Gutierrez and Gonzales were at the scene before the tow truck arrived.  See Tr. at 119:13-18 (Juarez).  He asserted that the United States did not pursue that line of questioning with its witness.  See Tr. at 119:21-23 (Juarez).  Reyes-Vencomo argued that the officers were supposed to reflect whether someone is available to take possession of the vehicle and that none of the police reports contain a reference to that policy.  See Tr. at 119:24-120:6 (Juarez).  He contended that the United States failed to meet the inventory search exception.  See Tr. at 120:7-9 (Juarez).  Reyes-Vencomo asserted that Atwater v. City of Lago Vista and Virginia v. Moore stand for the proposition that the Fourth Amendment is paramount when analyzing an arrest, and that it is important for the Court to look closely at whether a violation of N.M.S.A. 1978, §§ 66-5-16 or 66-5-2 is a crime.  See Tr. at 120:9-16 (Juarez).  He argued that, if violations of those statutes are not crimes, then the arrest was invalid under the Fourth Amendment, because Atwater v. City of Lago Vista and Virginia v. Moore provide

that an officer may arrest an individual for any petty offense, so long as that offense is a crime.
See Tr. at 120:19-25 (Juarez).  Reyes-Vencomo contended that there is no crime here and that those
provisions are mere policy statements without a penalty.  See Tr. at 121:1-10 (Juarez).  He asserted
that it would be nice to believe that Vigil was investigating identity concealment, but that the
testimony did not support such a suggestion.  See Tr. at 121:11-16 (Juarez).  Reyes-Vencomo
contended that, for whatever reason, Vigil became fixated with the fraudulent Social Security card
and detained him.  See Tr. at 121:16-22 (Juarez).  He argued that the question is not where the arrest
occurred, but when the detention exceeded the scope of the stop.  See Tr. at 121:22-24 (Juarez).  He
asserted that the detention occurred when Vigil decided to "run" his Social Security card.  Tr. at
122:1-2 (Juarez).  Reyes-Vencomo stated that his insurance and registration were recognized as
valid documents, but that the Social Security number was not a valid number.  See Tr. at 122:2-6
(Juarez).  He argued that Vigil then grabbed him by the arm and escorted him to the police vehicle,
because he wanted to further investigate the Social Security number.  See Tr. at 122:6-12 (Juarez).
He contended that there was no crime at this point and that Vigil was not concerned that he was
concealing his identity, because Vigil knows S. Reyes.  See Tr. at 122:12-20 (Juarez).

## RELEVANT FOURTH AMENDMENT LAW

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons,
houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and
no Warrants shall issue, but upon probable cause."  U.S. Const. amend IV.  For Fourth Amendment
purposes, the Supreme Court has identified three categories of police-citizen encounters:
(i) consensual encounters, which are not considered "seizures" within the meaning of the Fourth
Amendment, and therefore need not be supported by suspicion of criminal wrongdoing;
(ii) investigative stops, in which an officer may briefly detain a person based on reasonable

-26-

suspicion of criminal activity; and (iii) arrests, which are justified only if the officer has probable

cause to believe that the subject has committed a crime.  See, e.g., Florida v. Bostick, 501 U.S. 429,

434-36 (1991); Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000)(citing Florida v. Royer, 460

U.S. 491, 497-98 (1983)).

### 1.   **Investigative Detentions and Reasonable Suspicion.**

An encounter that is not consensual may nevertheless be constitutional as an investigative

detention.  An investigative detention occurs when an officer stops and briefly detains a person "in

order to determine his identity or to maintain the status quo momentarily while obtaining more

information."  Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. 143, 146

(1972)).  Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure

and must meet two distinct requirements to be "reasonable" under the Fourth Amendment.  First,

the officer "must have a particularized and objective basis for suspecting the particular person

stopped of criminal activity."  Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cortez,

449 U.S. 411, 417-18 (1981)).  Second, the investigative detention that follows the stop must be

"reasonably related in scope to the circumstances" which justified the stop in the first place, Terry

v. Ohio, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on both the length of

the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229

(10th Cir. 2001)(en banc).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent

conduct;' he or she simply must possess 'some minimal level of objective justification' for making

the stop."  United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v.

Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)).  This standard is met by information "falling

'considerably short' of a preponderance standard."  United States v. Winder, 557 F.3d at 1134.  A

police/citizen encounter that goes beyond the limits of a stop under Terry v. Ohio is an arrest which must be supported by probable cause or consent to be valid.  See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").

An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger."  Terry v. Ohio, 392 U.S. at 27.  "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  Terry v. Ohio, 392 U.S. at 27.  A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."  Terry v. Ohio, 392 U.S. at 29.  In evaluating the validity of the stop-and-frisk, the totality of the circumstances must be considered.  See Florida v. Bostick, 501 U.S. 429, 436 (1991).

These stop-and-frisk principles apply with equal weight to motorists and to pedestrians.  See Michigan v. Long, 463 U.S. 1032, 1050-51 (1983).  The Tenth Circuit has adopted the doctrine in Terry v. Ohio for an investigative detention -- "stop" --  and for a protective search --  "frisk."

> Terry has come to stand for two distinct propositions -- an investigative detention ('stop') in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, . . . and a protective search ('frisk') which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.

United States v. King, 990 F.2d 1552, 1557 (10th Cir. 1997)(citations omitted).  The legal standard is whether a "stop and frisk" is reasonable under the Fourth Amendment.  United States v. King, 990 F.2d at 1557.

-28-

In United States v. Johnson, 364 F.3d 1185 (10th Cir. 2004), the Tenth Circuit held that an officer had reasonable suspicion to continue questioning and to frisk a suspect after: (i) the officer had responded to a call from a citizen who gave his telephone number, and gave a detailed and accurate description of possible criminal activity and of the suspect; (ii) the contact occurred in Albuquerque's highest-crime area; and (iii) the suspect displayed nervous behavior.  See 364 F.3d at 1194.  The Tenth Circuit noted that the officer's experience and training allowed him to make inferences, based on a combination of the surrounding circumstances, that criminal activity was afoot.  See United States v. Johnson, 364 F.3d at 1194. ("His suspicions were particularized to [the suspect], and were based on how his training and experience taught him to interpret a number of objectively reasonable details.").  While many of the factors that the Tenth Circuit considered did not, without more, give rise to reasonable suspicion, the combination of circumstances was sufficient.  See United States v. Johnson, 364 F.3d at 1193 (noting that the district court had erred, because "[a]ll of these factors, mitigating and aggravating, should have been analyzed as part of the totality of the circumstances faced by [the officer] at the inception of the detention").

In United States v. Ceballos, 355 F.App'x 226 (10th Cir. 2009)(unpublished), the police officer observed a young girl walking down the street at night.  See 355 F.App'x at 227-28.  A truck pulled up alongside the girl, the driver of the truck and the girl spoke briefly, then the truck drove ahead and the girl continued on her walk.  See United States v. Ceballos, 355 F.App'x at 228.  Rather than leave, however, the truck drove ahead and parked with its lights off at a dark spot on the road by which the girl would have to walk.  See United States v. Ceballos, 355 F.App'x at 228.  The officer spoke to the girl, who seemed unconcerned and told him that the man in the truck had asked only if she needed a ride; she had refused.  See United States v. Ceballos, 355 F.App'x at 228.  Not investigating any particular crime or suspected-crime, and admittedly acting on a "hunch," the

officer turned on his emergency lights and pulled up behind the truck.  United States v. Ceballos, 355 F.App'x at 228.  Upon talking to Ceballos, the officer discovered that Ceballos' breath smelled of alcohol, he did not have a driver's license, and he had a gun and other items in his vehicle.  See United States v. Ceballos, 355 F.App'x at 228.  The Tenth Circuit found that the facts available to the officer would have led a reasonable officer to conclude that reasonable suspicion existed, and that the officer's "subjective characterization of his actions is irrelevant."  United States v. Ceballos, 355 F.App'x at 229.  The Tenth Circuit explained:

> A review of the totality of the circumstances shows Gallegos was not acting on an unparticularized hunch; during his testimony he articulated specific facts that caused him to suspect Ceballos intended to assault or abduct the teenage pedestrian. Specifically, at the time Gallegos initiated the traffic stop, he had observed Ceballos slow his vehicle as he passed a teenage girl walking alone late at night.  He then observed Ceballos alter his route by making a U-turn and following the girl down a narrow, nearly deserted residential street.  Ceballos pulled alongside the girl, who he did not know, and asked her if she wanted a ride.  She refused, telling him she lived up the street.  Ceballos then drove further down the road, pulled into a driveway as if to turn around and return to the main road, but instead backed out and drove a few feet further east, in the same direction the girl was walking.  He parked in a dark location and turned off his lights.
>
> . . . .
>
> We agree with the Government that Officer Gallegos had reasonable suspicion to stop and detain Ceballos.  Ceballos showed an interest in a teenage girl he did not know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home.  The facts found by the district court, viewed in totality, amply support the constitutionality of the investigative detention.

United States v. Ceballos, 355 F.App'x at 228-30.  The Tenth Circuit did not require the officer to identify the particular crime of which he she had reasonable suspicion, or even to acknowledge that he had reasonable suspicion.  The Tenth Circuit was content to find that a reasonable officer would have reasonable suspicion that "Ceballos intended to assault or abduct the teenage pedestrian."  United States v. Ceballos, 355 F.App'x  at 229.  The Tenth Circuit demanded only that an officer

have facts from which a reasonable officer could form a reasonable suspicion that criminal conduct

was occurring or was about to occur.  See United States v. Ceballos, 355 F.App'x at 229.

>    2.    **Traffic Stop.**

"A traffic stop is a 'seizure' within the meaning of the Fourth Amendment."  United States

v. Harmon, 785 F.Supp.2d 1146, 1158 (D.N.M. 2011)(Browning, J.)(quoting United States v. Holt,

264 F.3d at 1220).  Courts

> assess the reasonableness of a routine traffic stop under the principles laid out for
> investigative detentions in Terry v. Ohio, 392 U.S. 1 . . . (1968), considering
> "whether the officer's action was justified at its inception, and whether it was
> reasonably related in scope to the circumstances which justified it in the first place.

United States v. Wilson, 96 F.App'x 640, 643 (10th Cir. 2004)(unpublished).  "A traffic stop is valid

under the Fourth Amendment if the stop is based on an observed traffic violation or if the police

officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is

occurring."  United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995).  See United States

v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009).  Whether the police officer making the stop had

any other motivation for the stopping the vehicle is irrelevant.  See United States v. Cervine, 347

F.3d 865, 870 (10th Cir. 2003); United States v. Botero-Ospina, 71 F.3d at 787; United States v.

Hunnicut, 135 F.3d 1345, 1348 (10th Cir. 1998).  The Terry v. Ohio framework applies whether the

traffic stop is based on probable cause or reasonable suspicion.  See United States v. Harmon, 785

F.Supp.2d at 1158.  A court must examine "both the length of the detention and the manner in which

it was carried out," United States v. Holt, 264 F.3d at 1230, "keeping in mind that an officer may

extend the duration and scope of the initial detention based on 'an objectively reasonable and

articulable suspicion that illegal activity has occurred or is occurring,'" United States v. Wilson, 96

F.App'x at 643 (quoting United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001)).  "When the

stop is extended based on reasonable suspicion, the further detention must, like the original traffic

stop, 'be temporary, lasting no longer than necessary to effectuate the purpose of the [further

detention], and the scope of the [further] detention must be carefully tailored to its underlying

justification.'" United States v. Wilson, 96 F.App'x at 644 (alterations original)(quoting United

States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997)).

Requesting the driver's identification and running a check for warrants is unlawful under

some circumstances.  In United States v. Hensley, 469 U.S. 221 (1985), the Supreme Court held that,

where a defendant was stopped in response to a "wanted flyer" from another department, it was

proper for the police to check his identification.  469 U.S. at 232.  In the context of a traffic stop,

the Tenth Circuit has "consistently held": "An officer conducting a routine traffic stop may request

a driver's license and vehicle registration, run a computer check, and issue a citation." United States

v. Gonzalez-Lerma, 14 F.3d 1479, 1483 (10th Cir 1994), overruled on other grounds by United

States v. Botero-Ospina, 71 F.3d at 787.  See also United States v. Hunter, 663 F.3d 1136, 1144

(10th Cir. 2011); United States v. Kelly, No. 10-2057, 2010 WL 5173599, at *11 (D.N.M. Nov. 17,

2010)(Browning, J.)(finding that the defendant's Fourth Amendment rights were not violated where

police officer asked for the defendant's license, registration, and proof of insurance).

   **3.    Arrests.**

A seizure that exceeds the investigative detention's limited scope or duration may

nevertheless be justified as an arrest.  An arrest is a seizure that is "characterized by highly intrusive

or lengthy search or detention."  Oliver v. Woods, 209 F.3d at 1186 (quoting United States v.

Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)).  The general rule is that "the use of firearms,

handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been

placed under arrest.  United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994).

See Florida v. Royer, 460 U.S. 491, 499 (1983).  The use of handcuffs, however, does not always elevate a detention into an arrest.  See United States v. Albert, 579 F.3d 1188, 1195 (10th Cir. 2009).  Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, probable cause must support the arrest.

"Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'"  United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001))(citing Draper v. United States, 358 U.S. 307, 313 (1959)).  Although "[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require more than mere suspicion."  United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(internal quotation marks omitted).  The Supreme Court has made the following distinction between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio, 392 U.S. 1 (1968), and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard.  See Beck v. Ohio, 379 U.S. 89, 96 (1964).  "The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive."  United States v. Valenzuela, 365 F.3d at 896-97 (citing Florida v. Royer, 460 U.S. 491, 507 (1983); United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir. 2002)).  Thus, the primary consideration is "whether a reasonable officer would have believed

that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(alterations omitted)(internal quotation marks omitted).

### 4.    Inventory Searches.

An inventory search undertaken pursuant to impoundment or the authority to impound "constitutes a well-defined exception to the warrant requirement." Illinois v. Lafayette, 462 U.S. 640, 643 (1983). See South Dakota v. Opperman, 428 U.S. 364, 372 (1976). Discussing the relationship between probable cause and inventory searches in its opinion in United States v. Griffin, 729 F.2d 475 (7th Cir. 1984), the United States Court of Appeals for the Seventh Circuit stated:

> In applying the reasonableness standard adopted by the Framers, [the] Court has consistently sustained police intrusions into automobiles impounded or otherwise in lawful police custody where the process is aimed at securing or protecting the car and its contents. Thus, the justification for an inventory search does not rest on probable cause and the absence of a warrant is immaterial to the reasonableness of the search.

729 F.2d at 481 (citations omitted)(internal quotation marks omitted)(quoting Illinois v. Lafayette, 462 U.S. at 643). "The policies behind the warrant requirement are not implicated in an inventory search." Colorado v. Bertine, 479 U.S. 367, 371 (1987)(citing South Dakota v. Opperman, 428 U.S. at 370 n.5). Inventory searches developed in response to three needs: (i) the need to protect the owner's property while it remains in police custody; (ii) the need to protect the police against claims or disputes over lost, stolen, or vandalized property; and (iii) the need to protect the police from danger. See South Dakota v. Opperman, 428 U.S. at 369. Inventory searches are allowed to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger. See Florida v. Wells, 495 U.S. 1, 2 (1990)(citing South Dakota v. Opperman, 428 U.S. at 369).

A warrantless inventory search is proper when the search is conducted pursuant to standard

police procedures for the purpose of protecting the car and its contents.  See United States v. Maraga, 76 F.App'x 223, 228 (10th Cir. 2003)(unpublished)("An impoundment must either be supported by probable cause, or be consistent with the police role as 'caretaker' of the streets and completely unrelated to an ongoing criminal investigation."); United States v. Lugo, 978 F.2d 631, 636 (10th Cir. 1992)("When the police acquire temporary custody of a vehicle, a warrantless inventory search of the vehicle does not offend Fourth Amendment principles so long as the search is made pursuant to 'standard police procedures' and for the purpose of 'protecting the car and its contents.'")(quoting South Dakota v. Opperman, 428 U.S. at 372));.  "The policy or practice governing inventory searches should be designed to produce an inventory." Florida v. Wells, 495 U.S. at 4 (citing Colorado v. Bertine, 479 U.S. at 376).  "[I]n forbidding uncanalized discretion to police officers conducting inventory searches, there is no reason to insist that they be conducted in a totally mechanical 'all or nothing' fashion." Florida v. Wells, 495 U.S. at 4.  A court can consider an officer's testimony regarding the procedures and the purpose of the search as evidence. See United States v. Lugo, 978 F.2d at 637.  A written policy concerning inventory searches is not necessary; an oral policy is sufficient to meet the standard procedure test that the Tenth Circuit articulated in United States v. Lugo.  See Molina v. Spanos,208 F.3d 226, 1999 WL 626126, at *9 (10th Cir. 1999)(unpublished table decision); United States v. Jacquez, 409 F.Supp.2d 1286, 1298 (D.N.M. 2005)(Browning, J.)("Although there may not be a written policy concerning inventory searches, including inventory searches of unlocked containers, an oral policy is sufficient to meet the standard procedure test articulated in United States v. Lugo.").

If an inventory search is conducted pursuant to department policy, to find the inventory search unconstitutional, the officers must have acted out of bad faith, for the sole purpose of investigation. See Colorado v. Bertine, 479 U.S. at 371 ("[T]here was no showing that the police,

who were following standardized procedures, acted in bad faith or for the sole purpose of investigation."); United States v. Moraga, 76 F. App'x 223, 228 (10th Cir. 2003)("Inventory searches must be conducted according to standardized procedures, and the police must act in good faith and cannot search for the sole purpose of investigation.").  Inventory searches, however, "must not be a ruse for a general rummaging in order to discover incriminating evidence."  United States v. Martinez, 512 F.3d 1268, 1274 (10th Cir. 2008)(quoting Florida v. Wells, 495 U.S. at 4)(internal quotation marks omitted).  If a police officer performs an inventory search of a vehicle before ultimately deciding not to have it towed, a court must determine "whether at the time of the inventory search [the officer] reasonably believed that the car would be towed."  United States v. Henderson, 61 F.3d 906, 1995 WL 431397, at *3 (7th Cir. 1995)(before Posner, C.J., Cummings, J., and Ripple, J.)(unpublished table decision).

## RELEVANT LAW ON THE EXCLUSIONARY RULE

When evidence is obtained in violation of a person's constitutional rights, the police will be prohibited from using that evidence in a criminal prosecution of that person.  See United States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.")(citations omitted). The police are prohibited from using evidence that is obtained as a result of a constitutional violation as well.  See McDonald v. United States, 335 U.S. 451, 453 (1948).  For the exclusionary rule to apply, the defendant need show, by a preponderance of the evidence, a constitutional violation, and a causal nexus between the violation and the evidence sought to be excluded.  See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006).  Once the defendant makes this showing, if the prosecutor still desires to proffer the challenged evidence, the burden shifts to the prosecution to establish that some exception to the exclusionary

rule applies.  See United States v. Torres-Castro, 470 F.3d at 999.

## ANALYSIS

In support of his motion, Reyes-Vencomo advances three arguments: (i) his continued detention after providing the officers his vehicle registration and proof of insurance constitutes an unlawful seizure under the Fourth Amendment; (ii) Vigil's request for Reyes-Vencomo's Social Security number exceeded the lawful scope of the traffic stop; and (iii) the inventory search was conducted in an unlawful manner.  The Court finds that law enforcement officers lawfully detained Reyes-Vencomo to investigate and confirm his identity.  The request for Reyes-Vencomo's Social Security number did not exceed the traffic stop's lawful scope, because Reyes-Vencomo could not provide his driver's license and the officer was attempting to confirm his identity.  Furthermore, the inventory search was conducted in compliance with standardized police procedures and was for a non-investigatory purpose.

## I.     MOST OF THE DISPUTED FACTS ARE NOT MATERIAL.

At the hearing it was apparent that some of the facts are in dispute.  While the Court has resolved those disputes in its factual findings pursuant to rule 12(d), the Court notes that most of the facts at issue were not material for the purposes of this Memorandum Opinion and Order.  The Court observed four disputed facts: (i) whether Vigil asked for a Social Security card or number, see Tr. at 32:4-12 (Juarez, Vigil); (ii) whether Vigil yelled slurs against Mexicans, see id. at 71:3-9 (Torrez, Reyes-Vencomo); id. at 84:13-16 (Torrez, Ortega); (iii) the order of arrival at the scene after Reyes-Vencomo's arrest, see id. at 117:23-118:13 (Torrez); id. at 119:11-18 (Juarez); and (iv) whether Reyes-Vencomo asked if S. Reyes or Gutierrez could take possession of his vehicle, see id. at 69:17-20 (Juarez, Reyes-Vencomo).

The first two factual disputes are not material to the ultimate question whether the stop

violated the Fourth Amendment, because: (i) whether Vigil asked for a Social Security card or number presents the same issue about exceeding the scope of the stop; and (ii) whether Vigil yelled slurs against does not effect the legality of the stop, because there is no question of consent.  The second two factual disputes both go to whether the inventory search was properly conducted and whether Reyes-Vencomo directed that someone immediately available at the scene take his vehicle to his home.  Two police officers testified that Reyes-Vencomo was locked in the back of a police vehicle and that they did not observe him communicating with anyone at the scene.  See Tr. at 55:2-57:4 (Torrez, Holfelder); id. at 90:15-91:3 (Torrez, Ortega).  Reyes-Vencomo, however, asserted that he asked an officer to permit S. Reyes or Gutierrez to take the vehicle and that his stepdaughter was on the scene immediately.  See Tr. at 69:17-20 (Juarez, Reyes-Vencomo); id. at 77:8-78:5 (Torrez, Reyes-Vencomo).  During their testimony, the officers were calm and their statements consistent, both internally and with each other.  In contrast, Reyes-Vencomo was much more animated on the witness stand, his statements were not always internally consistent, and some of his assertions, such as stating that the police officer never asked for a driver's license, were not credible. Based on the Court's careful observation of the testimony and review of the evidence submitted, the Court found the officers statements more credible.  With respect to the order of persons arriving at the scene, the Court also needs to make a credibility determination.  Reyes-Vencomo testified that his stepdaughter was immediately on the scene.  See Tr. at 77:8-78:5 (Torrez, Reyes-Vencomo).  Holfelder testified, however, that no one arrived until after he began his inventory search.  See  Tr. at 63:17-18 (Juarez, Holfelder); Tr. at 65:25-11 (Torrez, Holfelder).  Vigil also testified that Gonzales arrived "way after" the arrest and after the tow-truck had been called.  See Tr. at 43:18-22 (Juarez, Vigil).  Reyes-Vencomo argued that the United States did not establish whether Gonzales or Gutierrez were there before the inventory search.  See Tr. at 119:11-18 (Juarez).  The Court finds,

however, that the testimony of Holfelder is credible, and established that he arrived and began his inventory before Gutierrez or Gonzales arrived at the scene.

**II      THE TRAFFIC STOP, DETENTION, AND ARREST OF REYES-VENCOMO WAS BASED ON REASONABLE SUSPICION AND PROBABLE CAUSE THAT REYES-VENCOMO WAS ENGAGED IN CRIMINAL ACTIVITY.**

Vigil and Ortega lawfully stopped Reyes-Vencomo's vehicle.  They observed Reyes-Vencomo fail to come to a complete stop at a stop sign and saw him traveling at fifteen miles per hour above the posted speed limit.  Reyes-Vencomo's continued detention was justified, because the officers had probable cause to arrest him for driving without a driver's license or, alternatively, reasonable suspicion of criminal activity.

**A.      THE INITIAL TRAFFIC STOP WAS VALID, BECAUSE IT WAS BASED ON AN OBSERVED TRAFFIC VIOLATION.**

The first step in analyzing the reasonableness of a routine traffic stop is determining "whether the officer's action was justified at its inception."  United States v. Wilson, 96 F.App'x at 643.  "A traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."  United States v. Botero-Ospina, 71 F.3d at 787. See United States v. Winder, 557 F.3d at 1134.

Reyes-Vencomo does not dispute that he was stopped for a minor traffic infraction.  See Tr. at 1.  Vigil and Ortega testified at the evidentiary hearing that Reyes-Vencomo failed to come to a complete stop and was speeding.  See Tr. at 12:24-13:13 (Torrez, Vigil); id. at 82:15-83:2 (Torrez, Ortega); Vigil Report at 1; Probable Cause at 1; Ortega Report at 1.  The citations issued to Reyes-Vencomo indicate that he was stopped for a failure to come to a complete stop, in violation of N.M.S.A. 1978, § 66-8-116, and traveling forty miles per hour in a twenty-five miles-per-hour zone,

in violation of N.M.S.A. 1978, § 66-7-301.  See Stop Sign Citation at 1; Speeding Citation at 1.

Vigil and Ortega were justified in stopping Reyes-Vencomo's vehicle because they observed two

traffic infractions.  "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an

observed traffic violation."  United States v. Williams, 403 F.3d 1203, 1206 (10th Cir. 2005).

Accord United States v. Kelly, 2010 WL 5173599, at *11 ("The Court finds that Fisher was justified

in stopping Padilla's vehicle because he observed multiple traffic infractions.").  Vigil and Ortega

were justified in temporarily detaining Reyes-Vencomo, because he committed traffic offenses in

their presence.  See Whren v. United States, 517 U.S. 806, 808, 819 (1996)("Here the District Court

found that the officers had probable cause to believe that the petitioners had violated the traffic code.

That rendered the stop reasonable under the Fourth Amendment . . . .");  United States v. Patterson,

472 F.3d 767, 775 (10th Cir. 2006).

 Reyes-Vencomo does not dispute that the officers had reasonable suspicion and, indeed,

probable cause to stop him.  Accordingly, because the officers observed two traffic infractions, their

initial stop and detention of Reyes-Vencomo did not violate his rights under the Fourth Amendment.

 **B.**  **REYES-VENCOMO'S CONTINUED DETENTION WAS BASED ON PROBABLE CAUSE THAT HE WAS DRIVING WITHOUT A VALID DRIVER'S LICENSE AND REASONABLE SUSPICION OF CRIMINAL ACTIVITY.**

 Reyes-Vencomo contends that all evidence that the officers obtained, and all statements

elicited from him, stem from his unconstitutional continued detention.  See Motion to Suppress at

5.  He asserts that when "the investigation of the traffic offense is complete . . . the driver must be

allowed to proceed without further delay."  Motion to Suppress at 5 (citing United States v. Elliott,

107 F.3d 810, 813 (10th Cir. 1997)).  Reyes-Vencomo argues that a Social Security card is not

identification, that he had already adequately identified himself, and that questions regarding his

-40-

Social Security information exceeded the scope of the stop.  See Motion to Suppress at 6-7.  The United States asserts that, because Reyes-Vencomo was driving without a license, in violation of N.M.S.A. 1978, § 66-5-2, Vigil had probable cause to arrest Reyes-Vencomo.  See Response at 5.  The United States further asserts that Vigil had probable cause to arrest Reyes-Vencomo for concealing his identity.  See Response at 6 (citing N.M.S.A. 1978, § 30-2-3).  Finally, the United States argues that when Reyes-Vencomo assaulted Vigil, Reyes-Vencomo was subject to arrest for that offense.  See Response at 8.  Reyes-Vencomo argues in response that Vigil could not arrest him for the traffic infractions or for driving without a license.  See Reply at 3.  He contends that Vigil was not interested in whether he was "concealing" his identity and he was not cited for such an offense.  Reply at 3-4.

At the hearing, Reyes-Vencomo asserted that Vigil has consistently testified that the only reason he detained Reyes-Vencomo was to further investigate the Social Security information.  See Tr. at 99:15-18 (Juarez).  He argued that, at that moment, Vigil exceeded the scope of the stop, violating his rights, and illegally detaining him from that moment onward.  See Tr. at 99:23-100:1 (Juarez).  Reyes-Vencomo contended that he could not be arrested for driving without a license and cited Atwater v. City of Lago Vista for support.  See Tr. at 100:2-5 (Juarez).  Reyes-Vencomo argued that, under N.M.S.A. 1978, § 66-5-16, driving without a license is not a criminal offense and, thus, is not a violation for which he can be arrested.  See Tr. at 100:15-20 (Juarez).  He also asserted that using a false Social Security card as identification during a traffic stop is not a crime or at least not one for which that Vigil could arrest him.  See Tr. at 100:22-101:4 (Juarez).  The United States represented that the Court found that an officer could lawfully detain an individual driving without a license based on that violation.  See Tr. at 105:24-106:4 (Torrez).  The United States further asserted that the Tenth Circuit precedent, established in United States v. Galindo-Gonzales and

-41-

United States v. Zubia-Melendez, supports the Court's decision in United States v. Jacquez.  See Tr. at 106:7-11 (Torrez).  The United States argued that there are two provisions in the vehicle code which reference unlicensed driver, but that another provision in the New Mexico traffic code states that violations that are not otherwise penalized are considered misdemeanors.  See Tr. at 106:23-107:1 (Torrez)(citing N.M.S.A. 1978, § 66-8-7).

### 1.   When Reyes-Vencomo Failed to Produce a Driver's License, Vigil Could Detain Him for Violating N.M.S.A. 1978, §§ 66-5-2 and 66-5-16.

Requesting the driver's identification and running a check for warrants is lawful under some circumstances.  "[F]or example, the motorist may be detained for a short period while the officer runs a background check to see if there are any outstanding warrants or criminal history pertaining to the motorist, even though the purpose of the stop has nothing to do with such prior criminal history." United States v. Holt, 264 F.3d at 1221.  In the context of a traffic stop, the Tenth Circuit has "consistently held" that: "An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." United States v. Gonzalez-Lerma, 14 F.3d at 1483 .  See United States v. Hunter, 663 F.3d at 1144.  New Mexico law provides that "no person shall drive any motor vehicle" unless that person "holds a valid license issued under the provisions of the Motor Vehicle Code." N.M.S.A. 1978, § 66-5-2.  Additionally, New Mexico law requires that "[e]very licensee shall have his driver's license in his immediate possession at all times when operating a motor vehicle and shall display the license upon demand of a magistrate, a peace officer or a field deputy or inspector of the division." N.M.S.A. 1978, § 66-5-16.  It also provides that it "is a misdemeanor for any person to violate any provision of the Motor Vehicle Code, unless it is declared a felony." N.M.S.A. 1978, § 66-8-7(A).  See Howard v. Dickerson, 34 F.3d 978, 982 (10th Cir. 1994)(citing N.M.S.A. 1978, § 66-8-7(A))(noting that a

"violation of the Motor Vehicle Code constitutes a misdemeanor unless otherwise stated").

In Virginia v. Moore, a driver was arrested for driving on a suspended license despite a state law providing that the officer should have issued a summons for the driver instead of arresting him. See 553 U.S. at 164. The Supreme Court held that "warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution." Virginia v. Moore, 553 U.S. at 176. The Supreme Court noted that it had previously declined to "limit to felonies and disturbances of the peace the Fourth Amendment rule allowing arrest based on probable cause to believe a law has been broken in the presence of the arresting officer." Virginia v. Moore, 553 U.S. at 175. "Incorporating state-law arrest limitations into the Constitution would produce a constitutional regime no less vague and unpredictable than the one we rejected in Atwater." Virginia v. Moore, 553 U.S. at 175. In Atwater v. City of Lago Vista, the Supreme Court held that if "an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." 532 U.S. at 354 (finding that officer lawfully arrested a driver, for the purposes of the Fourth Amendment, for a misdemeanor seatbelt violation).

Neither N.M.S.A. 1978, § 66-5-2 nor N.M.S.A. 1978, § 66-5-16, proscribe a penalty for its violation or otherwise categorize the offense. Accordingly, N.M.S.A. 1978, § 66-8-7 applies. In State v. Trevizo, 150 N.M. 158, 257 P.3d 978 (Ct. App. 2011), the Court of Appeals of New Mexico, interpreting N.M.S.A. 1978, § 66-8-7, found that the New Mexico Legislature set the penalties for "violations of the Motor Vehicle Code to be consistent with the classification of petty misdemeanors found in the Criminal Code." 150 N.M. at 162, 257 P.3d at 982. The Fourth Amendment does not forbid a warrantless arrest for a minor criminal offense, even when it is punishable only by a fine. See Atwater v. City of Lago Vista, 532 U.S. at 323. Even though a petty misdemeanor is a minor

-43-

criminal offense, the Fourth Amendment permits an arrest when "an officer has probable cause to

believe that an individual has committed even a very minor criminal offense in his presence."

Atwater v. City of Lago Vista, 532 U.S. at 354.  States are free to provide motorists with more

protection than the Fourth Amendment provides, but federal law is uniform across the country.

Here, Vigil personally observed Reyes-Vencomo driving the truck and that Reyes-Vencomo was

unable to produce a driver's license when he requested one, in violation of N.M.S.A. 1978, § 66-5-

16.  Because failure to produce a driver's license constitutes a "misdemeanor" under N.M.S.A. 1978,

§ 66-8-7, which is consistent with a "petty misdemeanor" in the Criminal Code, State v. Trevizo,150

N.M. at 162, 257 P.3d at 982, Vigil could detain or arrest Reyes-Vencomo without running afoul

of the Fourth Amendment.  Furthermore, the Court has twice held that failure to produce a driver's

license justifies the continued detention of a driver.  In United States v. Jacquez, a police officer

stopped a driver, because he believed that there was an outstanding warrant for the driver's arrest.

See 409 F.Supp.2d 1296.  When the officer determined that he was mistaken, he continued to detain

the driver.  See United States v. Jacquez, 409 F.Supp.2d at 1296.  The Court held that the officer

"had subsequent justification to continue the detention," because "N.M.S.A. § 66-5-16 (1978),

requires a licensee to have a driver's license in immediate possession at all times when operating

a motor vehicle" and "Jacquez was driving the Escalade without a license."  United States v.

Jacquez, 409 F.Supp.2d at 1296.  In United States v. Aranda-Diaz, No. 08-2344, 2009 WL 1563419

(D.N.M. May 31, 2009)(Browning, J.), a police officer stopped a driver after he ran a red light, and,

when the officer requested identification, the driver could not produce any.  See 2009 WL 1563419,

at *13.  The Court held that "Aranda-Diaz' failure to produce the requested documents was a

violation of New Mexico Law," and that the officer was "justified in detaining Aranda-Diaz to

question him and try to ascertain his identify."  United States v. Aranda-Diaz, 2009 WL 1563419,

at * 13.

"Although probable cause to arrest is not necessary to justify the extension of an investigative detention, it is sufficient." United States v. Chavez, 550 F.3d 1215, 1224 (10th Cir. 2011).  Thus, Supreme Court and Tenth Circuit precedent establishes that Reyes-Vencomo's continued detention did not violate the Fourth Amendment, because Vigil had probable cause to believe that Reyes-Vencomo had violated N.M.S.A. 1978, § 66-5-2 and N.M.S.A. 1978, § 66-5-16.

> **2.    Even if Vigil Was Not Entitled to Arrest or Detain Reyes-Vencomo for Failing to Produce a Driver's License, His Request for the Social Security Number Did Not Exceed the Scope of the Traffic Stop and Gave Rise to Reasonable Suspicion of Criminal Activity.**

An officer "conducting a traffic stop may request vehicle registration and a driver's license, run a computer check, ask about travel plans and vehicle ownership, and issue a citation." United States v. Zubia-Melendez, 263 F.3d at 1161.  If a driver cannot provide a driver's license, a police officer is entitled to ask questions regarding identity.  See United States v. Zubia-Melendez, 263 F.3d at 1161 ("Once it was established that Galindo-Diaz could not provide evidence of identity or authority to drive the vehicle, Officer Heim was justified in requesting identifying information from Appellant."); United States v. Rivera, 867 F.2d 1261, 1263 (10th Cir. 1989)(holding that an officer could ask questions "relating to the identity and travel plans" of a driver and passenger during the course of a Terry stop).  The Tenth Circuit has held that "it is well-established that an officer may ask a suspect to identify himself" in the course of a Terry v. Ohio stop, because "obtaining a detainee's identity 'serves important government interests.'" United States v. Burleson, 657 F.3d 1040, 1046 (10th Cir. 2011)(citations omitted).  It reasoned that "an identity's utility in informing an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder, would be non-existent without the ability to use the identity to run a criminal background check."

United States v. Burleson, 657 F.3d at 1046 (citing United States v. Hensley, 469 U.S. 221, 229 (1985)).  The Tenth Circuit held that, "in obtaining the identities of . . . individuals, it is reasonable not only to ask them for their names, but also request identifications to confirm the veracity of their answers."  United States v. Burleson, 657 F.3d at 1048.  The Supreme Court has also held that an officer does not need reasonable suspicion to ask a driver for their immigration status.  See Muehler v. Mena, 544 U.S. 93, 101 (2005).

Reyes-Vencomo asserts that he had "already more than adequately identified himself" when Vigil asked for his Social Security number.  Motion to Suppress at 6.  When a driver cannot produce a driver's license, many courts have noted, without much discussion, that the officer will ask for a Social Security number or card to verify identity.  See United States v. Alexander, Nos. 09-5518, 09-5894, 2012 WL 48214, at *1, 5 (6th Cir. Jan. 10, 2012)(unpublished)(finding that officer's requests for identifying information, including Social Security number, when defendant could not produce identification did not exceed the scope of the stop); United States v. Smith, 164 F.App'x 825, 826 (11th Cir. 2006)(unpublished)(finding that defendant's continued detention was warranted where defendant could not provide a Social Security number); United States v. McColley, No. 3:09-00193, 2011 WL 253166, at *2 & n.3 (M.D. Tenn. Jan. 25, 2011)(finding that an officer did not exceed the scope of the traffic stop  and noting that officer asked for Social Security number when defendant could not produce an identification card); United States v. Sedillo, No. 08-1419, 2010 WL 965743, at *4 (D.N.M. Feb. 19, 2010)(Browning, J.)(noting that the officer asked for a Social Security number when the defendant could not produce a driver's license and finding that officer did not exceed scope of the traffic stop); United States v. Lopez-Guzman, 246 F.Supp.2d 1155, 1159-60 (D.Kan. 2003)(Crow, J.)(holding that an officer's questions about the defendant's Social Security number were sufficiently related to travel or officer safety such that they were not

-46-

unreasonable or beyond the scope of the stop).  The Court disagrees with Reyes-Vencomo's assertion that he had adequately identified himself.  While Reyes-Vencomo had provided his name, address, vehicle registration, and insurance, some people provide false information -- particularly aliases and misleading address -- to officers, and some of the information that Reyes-Vencomo provided would not assist Vigil in determining whether Reyes-Vencomo was subject to any warrants or allow Vigil to verify Reyes-Vencomo's identity.  See Tr. at 17:20-23 (Torrez, Vigil).  The ability to run a computer check on an individual stopped for a traffic offense is important for officer safety. See United States v. Burleson, 657 F.3d at 1046.  Furthermore, an officer is entitled to "request identification[] to confirm the veracity of [an individual's] answers." United States v. Burleson, 657 F.3d at 1048; United States v. Garcia, 87 F.App'x 707, 709 (10th Cir. 2004)(unpublished). Although Reyes-Vencomo provided the officer with some information about himself, he did not provide any identification.  A Social Security number is a unique number that the Social Security Administration issues; it is necessary to get a job, to collect Social Security benefits, and to receive some government services.[16]  Within the contexts of other statutes and circumstances, federal courts have noted that a Social Security number is a "means of identification."  United States v. Pena, No. 10-11715, 2011 WL 5903542, at *2 (11th Cir. Nov. 23, 2011)(unpublished)("The court then correctly identified the term 'means of identification' to include 'any name, Social Security number, date of birth, or official state or government issued driver's license or identification number."); Roth v. Guzman, 650 F.3d 603, 606 (6th Cir. 2011)("'Personal information' is defined as 'information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address . . . ."). When Vigil asked for a Social Security number, he was

_____

[16]Your Social Security Number and Card, SSA Publication No. 05-10002 (August 2011) available at http://www.ssa.gov/pubs/10002.html.

asking for a commonly available piece of information that would help him confirm the identity of the driver before him.  There is no information before the Court that Vigil was attempting to do anything other than confirm that Reyes-Vencomo was who he said he was.  Additionally, Reyes-Vencomo does not assert that the length of the detention was unreasonable, and the length of the period between the stop and the arrest does not appear to have been of unreasonable duration. See United States v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005)(finding that there was no de facto arrest and that the length of a detention was reasonable where the "majority of the nearly forty-five minute stop was spent completing the traffic stop, including time by [the officer] to confirm the identity of Sanchez based upon the highly suspect ID that he had provided").  Because a police officer is entitled to ask for information to confirm identity and run a computer check without exceeding the scope of the traffic stop, the Court finds that Vigil's  actions did not require reasonable suspicion or exceed the purpose of the traffic stop.  See United States v. Burleson, 657 F.3d at 1048; United States v. Garcia, 87 F.App'x at 709.

Once Vigil obtained the suspicious Social Security Card and was informed that there was no record of the Social Security number, he had reasonable suspicion of criminal activity and could detain Reyes-Vencomo for further investigation.  Vigil testified that he continued to detain Reyes-Vencomo, because the Social Security card he was given appeared fraudulent and dispatch indicated that there was no record of the Social Security number.  See Tr. at 20:15-20 (Torrez, Vigil).  The Tenth Circuit has stated that it judges an officer's "conduct in light of common sense and ordinary human experience, and . . . accord[s] deference to an officer's ability to distinguish between innocent and suspicious actions."  United States v. Ceballos, 355 F.App'x at 229 (citing United States v. Williams, 271 F.3d 1262, 1268 (10th Cir. 2001)).  An officer's "subjective characterization of his actions is irrelevant."  United States v. Ceballos, 355 App'x at 229.  In the context of probable

cause to search, the Tenth Circuit has characterized the ultimate issue as "whether the facts and circumstances within the officer's knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." United States v. Ledesma, 447 F.3d 1307, 1316 (10th Cir. 2006). The Court has stated, in other cases, that under the reasoning of United States v. Ceballos, even if the officer did not understand the basis for his reasonable suspicion, "so long as he was aware of facts from which a reasonable officer could draw an inference that criminal activity might be afoot, reasonable suspicion is present." United States v. McKenzie, No. 08-1669, 2010 WL 1795173, at *23 (D.N.M. Apr. 13, 2010)(Browning, J.). Accordingly, the Court looks to the totality of the circumstances to determine whether Vigil had reasonable suspicion of criminal activity that justified Reyes-Vencomo's continued detention. See United States v. Ceballos, 355 F.App'x at 229.

Here, the facts known to Vigil were as follows: (i) Reyes-Vencomo was irate, see Tr. at 20:21-23 (Torrez, Vigil); (ii) Reyes-Vencomo had no driver's license, see Tr. at 17:19-23 (Torrez, Vigil); id. at 85:22-86:7 (Torrez, Ortega); (iii) Reyes-Vencomo had presented him with a suspicious Social Security card, see Tr. at 19:12-19 (Torrez, Vigil); (iv) dispatch had informed him that there was no record of such a Social Security number, see Tr. at 20:2-3 (Torrez, Vigil); and (v) Reyes-Vencomo had stated that he received the card in the mail, which Vigil believed was not in conformity with normal practices, see Tr. at 20:13-14 (Vigil).[17] These circumstances are sufficient to establish reasonable suspicion of criminal activity.

---

[17]The Court has not found any information to support this statement regarding the mailing practices of Social Security cards and does not put much weight on this fact in its analysis of reasonable suspicion.

The United States contends that Vigil had reasonable suspicion to believe that Reyes-Vencomo was concealing his identity in violation of N.M.S.A. 1978, § 30-22-3.  <u>See</u> Response at 6.  N.M.S.A. 1978, § 30-22-3 provides

> Concealing identity consists of concealing one's true name or identity, or disguising oneself with intent to obstruct the due execution of the law or with intent to intimidate, hinder or interrupt any public officer or any other person in a legal performance of his duty or the exercise of his rights under the laws of the United States or this state.

> Whoever commits concealing identify is guilty of a petty misdemeanor.

The totality of the circumstances available to Vigil establish that he had reasonable suspicion to believe that Reyes-Vencomo might be concealing his identity.  Reyes-Vencomo presented no identification to the officers when he was stopped.  He could not produce a driver's license, turned over a possibly fraudulent Social Security card, and gave answer that set off a "red flag" when asked where the card came from.  Tr. at 20:13-14 (Vigil).  Vigil reasonably could have concluded that, if the Social Security card was fake, Reyes-Vencomo intended to conceal his identity to obstruct the due execution of the law, perhaps because a warrant existed for his arrest or that he had some other reason to hide his identity from law enforcement.  The Court agrees that the suspect Social Security card warranted further investigation and that a reasonable officer would have reasonable suspicion that Reyes-Vencomo might be concealing his true identity.  <u>See</u> <u>United States v. Gonzalez</u>, 290 F.App'x 80, 84 (10th Cir. 2008)("Thus, the 'the evaluation is made from the perspective of the reasonable <u>officer</u>, not the reasonable person").

Reyes-Vencomo argues that the officers never asserted that they were concerned whether Reyes-Vencomo was concealing his true identity.  <u>See</u> Reply at 3.  The Tenth Circuit, however, does not require that an officer state the basis of his reasonable suspicion.  <u>See</u> <u>United States v. Turner</u>, 553 F.3d 1337, 1345 (10th Cir. 2009)("[T]he probable cause inquiry is not restricted to a particular

offense, but rather requires merely that officers had reason to believe that a crime -- any crime -- occurred."); United States v. Ceballos, 355 F.App'x at 229 ("But Gallegos's subjective characterization of his actions is irrelevant."); Apodaca v. City of Albuquerque, 443 F.3d 1286, 1289 (10th Cir. 2006)("All that matters is whether [the officer] possessed knowledge of evidence that would provide probable cause to arrest [the defendant] on some ground." (emphasis original)).  In United States v. Ceballos, the Tenth Circuit did not require the officer to identify the particular crime of which he or she had reasonable suspicion, or even to acknowledge that he or she had reasonable suspicion.  The Tenth Circuit was content to find that a reasonable officer would have reasonable suspicion that "Ceballos intended to assault or abduct the teenage pedestrian."  United States v. Ceballos 355 F.App'x at 229.  Accordingly, based on the facts known to Vigil during Reyes-Vencomo's continued detention, reasonable suspicion of criminal activity existed and justified the continued detention.  See United States v. Brigham, 382 F.3d 500, 509 (5th Cir. 2004)("Once the officer learned that [the passenger's] I.D. was likely false, [the officer] acted reasonably with further questioning, to uncover [the passenger's] true identity and perform a correct background check."); United States v. Gonzalez-Lerma, 14 F.3d 1479, 1484 (10th Cir. 1994)(holding that an "officer's continued investigative detention was supported by reasonable suspicion of illegal activity," where the driver had an unsigned title, no vehicle registration, and presented two inconsistent identifications); United States v. McColley, 2011 WL 253166, at *5 ("Defendant provided a false name and claimed not to know his Social Security number, something that piqued Officer Gray's curiosity.  This curiosity turned to suspicion when the provided name -- 'Sanchez Rucker' -- returned no results.  Officer Gray was entitled to investigate the matter . . . .").

Because Vigil had probable cause to arrest Reyes-Vencomo, as well as reasonable suspicion of other criminal activity, Reyes-Vencomo's continued detention was justified.

3.      **Vigil Also Had Reasonable Suspicion of an Immigration Offense.**

At the hearing, Reyes-Vencomo suggested that Vigil was attempting to enforce federal immigration law, which he has no jurisdiction to enforce.  See Tr. at 4:21-5:2 (Juarez).  Whether a police officer has jurisdiction to arrest for an offense, however, is not determinative in the Fourth Amendment analysis.  See United States v. Gonzales, 535 F.3d 1174, 1183 (10th Cir. 2008).

In United States v. Turner, 553 F.3d 1337 (10th Cir. 2009), the defendant argued that the only crime for which the authorities had probable cause was that of being a felon in possession of ammunition, a federal but not state law violation, and that the local police department did not possess authority to arrest him for that offense.  See 553 F.3d at 1345.  The Tenth Circuit held, pursuant to the Supreme Court's decisions in Virginia v. Moore and Atwater v. City of Lago Vista, that, "because arrests made in violation of state law are not per se unreasonable under the Fourth Amendment, it does not matter for the purposes of our analysis whether [the local police department] had jurisdictional authority under state law." United States v. Turner, 553 F.3d at 1346. The Tenth Circuit rejected the defendant's argument that, "because possession of ammunition is not a crime under state law, state law enforcement could not arrest and detain him on that basis." United States v. Turner, 553 F.3d at 1346.  It concluded that, "[e]ven if state law prohibits state police from arresting for a federal offense (and we are not convinced that it does), that fact alone does not render the arrest a violation of the Fourth Amendment." United States v. Turner, 553 F.3d at 1346. Additionally, the Tenth Circuit, in United States v. Gonzales, found that the police officers' traffic stop of the defendant, outside of their jurisdiction and in violation of Colorado law, did not violate the Fourth Amendment. See 535 F.3d at 1183.  Other courts have also found, in the civil context, that a state or local police officer does not violate the clearly established Fourth Amendment law when he detains or arrests a defendant for an immigration violation, despite his lack of authority to

do so under state law.  See Martinez-Medina v. Holder, No. 06-75778, 2011 WL 855791, at *8 (9th

Cir. 2011)("Thus, even if a reasonable Oregon law enforcement officer should have known he

lacked authority under his own state's law to apprehend aliens based solely on a violation of federal

immigration law, that cannot serve as the basis for finding an egregious Fourth Amendment

violation."); Estrada v. Rhode Island, 594 F.3d 56, (1st Cir. 2010)("Officer Chabot is thus entitled

to qualified immunity for alleged violations of state or federal laws surrounding the seizure of

Plaintiffs and their subsequent escort to the Providence ICE office.").[18]

_____

[18]The United States Court of Appeals for the Ninth Circuit recently upheld, in United States
v. Arizona, 641 F.3d 339 (9th Cir. 2011), a decision from the United States District Court for the
District of Arizona which found that federal law likely preempted the State of Arizona's new
immigration law, S.B. 1070, and granted the United States' motion for a preliminary injunction in
part.  See 641 F.3d at 343-44.  S.B. 1070 "establishes a variety of immigration-related state offenses
and defines the immigration-enforcement authority of Arizona's state and local law enforcement
officers."  United States v. Arizona, 641 F.3d at 344.  The Supreme Court granted certiorari.  See
Arizona v. United States, 132 S.Ct. 845 (2011).  The Ninth Circuit found that S.B. 1070 "stands as
an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,"
because the law "subverts Congress' intent that systematic state immigration enforcement will occur
under the direction and close supervision of the Attorney General."  United States v. Arizona, 641
F.3d at 352.  Even in this decision, however, where the Ninth Circuit recognized federal supremacy
in the field of immigration enforcement, the Ninth Circuit agreed that "Congress envisioned,
intended, and encouraged inter-governmental cooperation between state and federal agencies, at
least as to information regarding a person's immigration status."  United States v. Arizona, 641 F.3d
at 351 n.10.  Accordingly, this decision also recognizes the role of the states, and state law
enforcement officers, in enforcing federal immigration laws.  In a footnote, the Ninth Circuit states
that Muehler v. Mena, 544 U.S. 93 (2005) did "not recognize that state officers can enforce federal
civil immigration law with no federal supervision or involvement."  United States v. Arizona, 641
F.3d at 362 n. 21.  See Muehler v. Mena, 544 U.S. at 101 (holding that there was no additional
seizure prolonging the stop and that "the officers did not need reasonable suspicion to ask Mena for
her name, date and place of birth, or immigration status").  United States v. Arizona does not address
whether a state officer's enforcement of federal immigration law violates the Fourth Amendment,
and because the case does not present that question to the Supreme Court, it will likely not address
that issue.  Current Ninth Circuit and Tenth Circuit precedent, however, suggests that a state or local
police officer does not violate the Fourth Amendment when he arrests or detains someone to
investigate a federal offense.  See Martinez-Medina v. Holder, 2011 WL 855791, at *8 ("Thus, even
if a reasonable Oregon law enforcement officer should have known he lacked authority under his own
state's law to apprehend aliens based solely on a violation of federal immigration law, that
cannot serve as the basis for finding an egregious Fourth Amendment violation."); United States v.

The Court addressed a similar issue in United States v. Hernandez-Lopez, 761 F.Supp.2d 1172 (D.N.M. 2010)(Browning, J.), and found that, "[a] reasonable officer would not stop a vehicle based on suspicion of a crime over which the officer knew he or she no jurisdiction." 761 F.Supp.2d at 1199. There, a United States Border Patrol ("Border Patrol") agent stopped the defendant's vehicle. United States v. Hernandez-Lopez, 761 F.Supp.2d at 1177-78. In that case, however, the United States conceded that the agent must "have had reasonable suspicion of criminal activity that is within the jurisdiction of the Border Patrol" and that "the Border Patrol has no jurisdiction to enforce the New Mexico traffic code." United States v. Hernandez-Lopez, 761 F.Supp.2d at 1185. The United States also moved to dismiss the indictment against the defendant without appealing the Court's decision. See United States v. Hernandez-Lopez, No. 10-0769, Motion to Dismiss Indictment, filed January 15, 2011 (Doc. 54). The circumstances the Court addressed in United States v. Hernandez-Lopez were the opposite of those before the Court in this case -- it addressed a federal officer trying to enforce state law, rather than a state officer attempting to enforce federal law. This distinction is an important one, because in United States v. Gonzales and United States v. Turner, the Tenth Circuit relied on Atwater v. City of Lago Vista and Virginia v. Moore, where the Supreme Court held that, while state law may "'vary from place to place and time to time,' Fourth Amendment protections are not so 'variable' and cannot be made to turn on such trivialities.'" Virginia v. Moore, 553 U.S. at 172. See United States v. Gonzales, 535 F.3d at 1182 (citing Virginia v. Moore, 553 U.S. at 172).[19] Although United States v. Gonzales and United States

Turner, 553 F.3d at 1346 ("Even if state law prohibits state police from arresting for a federal offense (and we are not convinced that it does), that fact alone does not render the arrest a violation of the Fourth Amendment.").

[19]Because United States v. Hernandez-Lopez involved different factual circumstances, the Court need not decide whether it was correctly decided to determine the effect of an officer's lack

v. Turner were not squarely on point in United States v. Hernandez-Lopez, those cases directly address the circumstances of this case. Neither the Court nor the parties addressed United States v. Gonzales or United States v. Turner in the context of the motion to suppress in United States v. Hernandez-Lopez. Here, Vigil is a state officer who: (i) was handed a suspect Social Security card; (ii) was given a Social Security number with no record; (iii) was dealing with an irate driver; and (iv) was dealing with a driver without a driver's license. Although Reyes-Vencomo argues that Vigil lacked jurisdiction to investigate a federal offense, Tenth Circuit precedent suggest that Vigil's continued detention of Reyes-Vencomo to investigate that crime would not be unreasonable under the Fourth Amendment. Given the facts of the case and the Tenth Circuit's "reasonable officer" test, the Court finds that Vigil also had reasonable suspicion to further investigate a suspected immigration violation.

### C. OFFICER SAFETY CONCERNS JUSTIFIED DETAINING REYES-VENCOMO AWAY FROM HIS VEHICLE AND ORDERING HIM NOT TO REACH INTO HIS POCKET.

The Court notes that Reyes-Vencomo does not appear to challenge that Vigil, upon viewing the machete in the truck, could order that Reyes-Vencomo remain outside of the truck for the duration of the investigative detention. See Tr. at 21:6-18 (Torrez, Vigil). He also does not challenge that Vigil could order Reyes-Vencomo not to reach into a pocket for his cellular telephone. See Tr. at 22:8-23:3 (Torrez, Vigil). In any case, the Court finds that officer safety concerns justified both of Vigil's actions.

The Court finds that it was reasonable for Vigil, out of concern for officer safety and after viewing a weapon, to order that Reyes-Vencomo step away from the truck and out of reach of the

of jurisdiction would have, under the Fourth Amendment, in this case.

weapon while he conducted his investigation.  In Pennsylvania v. Mimms, 434 U.S. 106 (1977), the Supreme Court addressed whether an officer's routine practice of ordering drivers out of their vehicles was an unconstitutional intrusion on the drivers' Fourth Amendment rights.  See 434 U.S. at 107-08.  The Supreme Court held that ordering the driver out of the vehicle did not violate the Fourth Amendment.  See Pennsylvania v. Mimms, 434 U.S. at 108.  It found the "proffered justification -- the safety of the officer -- is both legitimate and weighty," and that the driver did not face a "serious intrusion upon the sanctity of the person." Pennsylvania v. Mimms, 434 U.S. at 111. The Supreme Court held that what "is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety."  Pennsylvania v. Mimms, 434 U.S. at 111. Additionally, the Tenth Circuit has held that, where officers reasonably believe that a defendant might have a weapon, they may justifiably order him out of the vehicle based on officer safety concerns.  See United States v. McHugh, 639 F.3d 1250, 1262 (10th Cir. 2011)("Removing McHugh from the car was an appropriate response, not just for officer safety but for that of all the participants . . . ."); United States v. Polly, 630 F.3d 991, 998 (10th Cir. 2011)(O'Brien, J. concurring)("Cortex then asked Polly to step out of the vehicle, which is also permissible during a routine traffic stop for purposes of officer safety.").  Here, the officers observed a weapon in the vehicle and were dealing with an irate driver; the officers justifiably feared for their safety.  Accordingly, it was reasonable for Vigil to order Reyes-Vencomo away from the vehicle and the weapon.

It was also reasonable for Vigil to order Reyes-Vencomo to keep his hands out of his pockets and to prevent him from reaching into the pockets.  Vigil had already observed a machete in Reyes-Vencomo's vehicle and did not know what Reyes-Vencomo might have in his pocket with the cellular telephone.  Vigil testified that he had not searched Reyes-Vencomo, could not determine for what he was reaching, and was concerned for officer safety.  See Tr. at 22:8-15 (Torrez, Vigil).

He further testified that standard police policy is to order suspects to keep their hands out of their pockets, or to secure their hands so that they cannot pull out a knife or gun. See Tr. at 22:16-22 (Torrez, Vigil). The United States Court of Appeals for the Sixth Circuit, in United States v. Mays, 643 F.3d 537 (6th Cir. 2011), held that "a nervous defendant who is 'digging' into his pockets" presented an officer safety concern, which justified frisking the defendant. 643 F.3d at 542. The Tenth Circuit has also held that, where an officer observes one weapon, that fact provides "a law enforcement officer with a reasonable belief that the person being briefly detained may be carrying other deadly weapons." United States v. Henning, 906 F.3d 1392, 1396 (10th Cir. 1996). In United States v. Robinson, 119 F.3d 663 (8th Cir. 1997), the United States Court of Appeals for the Eighth Circuit found that a pat-down search of the defendant was justified where the defendant was nervous, and "had taken his hands off of the steering wheel and moved them towards his waist." 119 F.3d at 667. At the time Vigil ordered Reyes-Vencomo not to reach into his pockets, Vigil was aware of the following: (i) Reyes-Vencomo had given him a possibly fraudulent Social Security number; (ii) he had no way to confirm Reyes-Vencomo's identity; (iii) Reyes-Vencomo had a machete in his vehicle; (iv) Reyes-Vencomo was irate and visibly frustrated; and (v) Reyes-Vencomo exited his vehicle in frustration without being asked. In these circumstances, Vigil justifiably feared for his safety when Reyes-Vencomo reached into his pocket. Vigil did as he was trained and ordered Reyes-Vencomo not to reach for the telephone. See Tr. at 22:8-24 (Torrez, Vigil). When Reyes-Vencomo continued to reach into his pocket, Vigil was justified in attempting to restrain him for officer safety.

Accordingly, Vigil reasonably ordered Reyes-Vencomo away from his truck and to refrain from reaching into his pockets out of concern for officer safety. Furthermore, when Vigil attempted to restrain Reyes-Vencomo, Reyes-Vencomo intentionally head-butted Vigil in the nose. See Tr.

at 25:4-19 (Torrez, Vigil); id. at 89:23-90:10 (Torrez, Ortega).  At this point, Vigil not only had

probable cause to arrest Reyes-Vencomo for driving without a driver's license, under N.M.S.A.

1978, § 66-5-16, but had probable cause to arrest him for assault, under N.M.S.A. 1978, § 30-22-21.

Because the initial stop, continued detention, and arrest of Reyes-Vencomo were valid and did not

violate the Fourth Amendment, the Court will not suppress the subsequent evidence or statements,

and will deny the Motion to Suppress on this basis.

### III.    HOLFELDER ACTED PURSUANT TO TAOS POLICE DEPARTMENT POLICY WHEN HE PERFORMED THE INVENTORY SEARCH OF REYES-VENCOMO'S VEHICLE.

The United States argues that the search of Reyes-Vencomo's vehicle was a valid inventory

search.  See Response at 9.  In the alternative, the United States asserts that it was a valid protective

sweep under United States v. Chambers, 383 F.App'x 719 (10th Cir. 2010)(unpublished).  See

Response at 9-10.  Reyes-Vencomo argues that there was no basis for the inventory search and that

any "protective sweep" would violate the Fourth Amendment as stated in Arizona v. Gant.  Reply

at 5.  At the hearing, Reyes-Vencomo asserted that two people were immediately available to drive

the vehicle back to his house and that Vigil had admitted that two people requested to take the

vehicle home.  See Tr. at 101:19-21 (Juarez).  He asserted that the only way to establish whether

someone is immediately available to take the vehicle is to ask and Holfelder had no contact with

him.  See Tr. at 102:10-103:1 (Juarez).  Additionally, Reyes-Vencomo contended that no officer

noted in his report that no one was available to take the vehicle, as the Taos policy requires.  See Tr.

at 103:1-7 (Juarez).  Reyes-Vencomo argued that, even if the Court finds that the arrest was valid,

the Court should grant the Motion to Suppress, because of the failure to follow the proper inventory

search procedure.  See Tr. at 103:8-14 (Juarez).  The United States asserted that Reyes-Vencomo

never told the officers that he wished for Gutierrez or Gonzales to take his vehicle to his home.  See

Tr. at 116:16-117:5 (Torrez).  It argued that the officers should not have to wait to see who might show up to take possession of an arrested individual's vehicle.  See Tr. at 117:21-118:1 (Torrez). The United States asserted that the women showed up after the tow truck had already been called and that, if the inventory was already underway, the bell had already rung, because the officers had found the weapons.  See Tr. at 118:1-6 (Torrez).  It contended that the officers acted in good faith because when they began the inventory search, no person was immediately available at the scene. See Tr. at 118:7-13 (Torrez).  In rebuttal, Reyes-Vencomo reiterated that it is the United States' burden to establish that the defendant's rights were not violated.  See Tr. at 119:11-12 (Juarez).  He emphasized that Gutierrez and Gonzales were at the scene before the tow truck arrived.  See Tr. at 119:13-18 (Juarez).  Reyes-Vencomo argued that the officers were supposed to reflect whether someone is available to take possession of the vehicle and that none of the police reports contain a reference to that policy.  See Tr. at 119:24-120:6 (Juarez).  He contended that the United States failed to meet the inventory search exception.  See Tr. at 120:7-9 (Juarez).

Because the inventory search was conducted in accordance with Taos Police Department Policy, it was a valid search in conformance with the Fourth Amendment.  Because the search was valid, the Court will deny the Motion to Suppress on this basis.

An inventory search undertaken pursuant to impoundment or the authority to impound "constitutes a well-defined exception to the warrant requirement."  Illinois v. Lafayette, 462 U.S. at 643.  Inventory searches developed in response to three needs: (i) the need to protect the owner's property while it remains in police custody; (ii) the need to protect the police against claims or disputes over lost, stolen, or vandalized property; and (iii) the need to protect the police from danger. See South Dakota v. Opperman, 428 U.S. at 369.  Inventory searches are allowed to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger.  See Florida v.

Wells, 495 U.S. at 2 (citing South Dakota v. Opperman, 428 U.S. at 369).  A warrantless inventory search is proper when the search is conducted pursuant to standard police procedures for the purpose of protecting the car and its contents.  See United States v. Maraga, 76 F.App'x at 228 ("An impoundment must either be supported by probable cause, or be consistent with the police role as 'caretaker' of the streets and completely unrelated to an ongoing criminal investigation."); United States v. Lugo, 978 F.2d at 636 ("When the police acquire temporary custody of a vehicle, a warrantless inventory search of the vehicle does not offend Fourth Amendment principles so long as the search is made pursuant to 'standard police procedures' and for the purpose of 'protecting the car and its contents.'").  "The policy or practice governing inventory searches should be designed to produce an inventory."  Florida v. Wells, 495 U.S. at 4 (citing Colorado v. Bertine, 479 U.S. at 376).

The Taos Police Department Towing Policy provides that "[t]owing a vehicle may be necessary as a matter of public safety, to protect property, or to preserve evidence."  Taos Police Department Towing Policy at 3.  The policy further states that: "When the operator of a vehicle is arrested and there is no one immediately available whom they want to take charge of the vehicle, it will be towed.  This decision shall be noted in the narrative of the report, which is completed."  Taos Police Department Towing Policy at 4.  Additionally, a "vehicle inventory will be completed and attached to any associated reports.  If there is an Offense/Incident report completed, place the case number on the top right corner of the inventory."  Taos Police Department Towing Policy at 5.  While it is possible that "this decision" could be construed as referring to the officer's decision to tow, it is not the best interpretation.  The Court construes the phrase "this decision" to refer to the driver's decision to allow someone else to take possession of his vehicle.  The Court believes that this construction is the appropriate reading of the policy, because the police officer has no decision

to make; the policy provides that, if no one is immediately available, the vehicle "<u>will</u> be towed."
Taos Police Department Towing Policy at 4 (emphasis added).  Accordingly, the police officer has
no discretion and can make no decision.  If no one is immediately available, the vehicle is towed.
Holfelder's construction of the policy supports the Court's construction, <u>see</u> Tr. at 55:16-23 (Torrez,
Holfelder); the policy has in mind people who are in the car -- such as in a driving while intoxicated
arrest -- or when cars are driving in tandem, and there are additional drivers available.  S. Reyes
might have qualified, had she not also been under arrest.  <u>See</u> Tr. at 26:9-27:12 (Torrez, Vigil); <u>id</u>.
at 90:11-18 (Torrez, Ortega).

   Holfelder testified that, when he arrived at the scene, another police officer suggested that
he inventory Reyes-Vencomo's truck.  <u>See</u> Tr. at 50:24-51:13 (Torrez, Holfelder).  He asserted that,
when he arrived, the only individuals at the scene were two sheriff's deputies, five Taos police
officers, and Reyes-Vencomo.  <u>See</u> Tr. at 63:2-14 (Juarez, Holfelder); <u>id</u>. at 55:8-19 (Torrez,
Holfelder).  Holfelder inventoried the truck, photographing and documenting the items inside.
<u>See</u> Tr. at 52:5-10 (Torrez, Holfelder); Inventory at 1.  He testified that Taos Police Department
Towing Policy's purpose is to protect the Taos Police Department and the Town of Taos, and to
provide a document noting what the vehicle held at the time that it was towed.  <u>See</u> Tr. at 53:24-
54:10 (Torrez, Holfelder).  After Holfelder began his inventory search, a young woman arrived at
the scene.  <u>See</u> Tr. at 63:17-18 (Juarez, Holfelder); <u>id</u>. at 65:25-66:11 (Torrez, Holfelder).  After his
arrest, however, Reyes-Vencomo made no contact with anyone at the scene.  <u>See</u> Tr. at 55:2-57:4
(Torrez, Holfelder); <u>id</u>. at 90:15-91:3 (Torrez, Ortega).  During the course of the search, Holfelder
and Ortega found and inventoried two boxes of ammunition and two handguns.  <u>See</u> Tr. at 58:4-60:2
(Torrez, Holfelder).

   The Taos Police Department Towing Policy states that it is designed to protect public safety

and to protect property.  See Taos Police Department Towing Policy at 3.  Holfelder testified to the administrative function of the Taos Police Department Towing Policy and described an inventory search as an exercise of the caretaker function.  See Tr. at 53:24-54:10 (Torrez, Holfelder).  See also Florida v. Wells, 495 U.S. at 2.  Accordingly, the unchallenged testimony and evidence establish that there is a uniform standardized policy to do a complete inventory search of a vehicle when a vehicle will be towed, because the owner is under arrest and no one is immediately available to take possession of the vehicle.  See United States v. Maraga, 76 F.App'x at 228.

With respect to whether someone was immediately available to take possession of the vehicle, Holfelder testified that, when he arrived at the scene, only law enforcement officers, and Reyes-Vencomo, were present.  See Tr. at 63:2-14 (Juarez, Holfelder).  Holfelder also testified that he arrived at the scene between 12:30 p.m. and 12:30 p.m. and the traffic stop took place a long time before he got there.  See Tr. at 50:22-23 (Torrez, Holfelder).  He asserted that he understood "immediately available" to refer to another vehicle occupant who was not going to be arrested or traveling in tandem with that vehicle.  Tr. at 55:16-23 (Torrez, Holfelder).  Furthermore, all of the officers testified that Reyes-Vencomo never requested that anyone take charge of his vehicle. See Tr. at 55:2-57:4 (Torrez, Holfelder); id. at 90:15-91:3 (Torrez, Ortega); id. at 43:11-15 (Juarez, Vigil).  The Taos Police Department Towing Policy does not require officers to ask whether there is someone available whom the operator of the vehicle wishes to take charge of the vehicle or that the officers wait for a designated  person to arrive at the scene to take charge of the vehicle.  See Taos Police Department Towing Policy at 4-5. The policy does not require officers to inquire whether someone is available to take the vehicle.  Furthermore, because the policy states that the person must be "immediately available," it does not require an officer to inquire whether someone is immediately available.  If officers were required, in every case, to ask whether someone was

-62-

available to take the vehicle, then the officers would have to wait while the driver attempted to locate someone and for that person to arrive.  The New Oxford American Dictionary defines "immediately" as "at once; instantly," or "without any intervening time or space."  New Oxford American Dictionary 869 (A. Stevenson & C.A. Lindberg eds., 3d ed. 2010). Were an officer to ask whether someone was available and wait for the designated person to arrive, there would be an "intervening time" while the officer had to wait and the person's presence would not be immediate.

In United States v. Jacquez, the Court addressed a similar issue.  See 409 F.Supp.2d at 1297.  There, the policy stated that "a vehicle shall not be towed when the registered owner or the legal custodian requests that it not be towed," and the defendant argued that the police officers should have explained the policy to him so that he could make a determination whether his vehicle should be towed.  See United States v. Jacquez, 409 F.Supp.2d at 1297.  The Court held that the policy put the onus on the driver to make the request and that the Court would not rewrite the policy to mandate an explanation.  See United States v. Jacquez, 409 F.Supp.2d at 1297.  Similarly, in United States v. Crawford, 294 F.App'x 466 (11th Cir. 2008), the United States Court of Appeals for the Eleventh Circuit held that, although the inventory search policy provided that a police officer could impound where no person was authorized and capable of taking control of the vehicle, it was not unreasonable for an officer to impound the vehicle without first locating another driver.  See 294 F.App'x at 272-73.  In United States v. Cartwright, 630 F.3d 610 (7th Cir. 2010), the Seventh Circuit also addressed an analogous policy.  See 630 F.3d at 615.  There, the defendant testified that she had called someone to take the her vehicle and that she would have allowed anyone, even a licensed stranger, to move the car.  See United States v. Cartwright, 630 F.3d at 615.  The Seventh Circuit held that the "Fourth Amendment does not require that the police offer these sorts of alternatives to impoundment."  United States v. Cartwright, 630 F.3d at 615.

The parties dispute whether someone was immediately available to take the vehicle.  The officers undertook the search of Reyes-Vencomo's vehicle pursuant to standard police procedures.  See United States v. Lugo, 978 F.2d at 631.  The policy's plain language does not require that the officers inquire whether anyone is available to take charge of a vehicle that would otherwise be towed.  The policy merely provides that, if someone is not "immediately available whom they want to take charge of the vehicle," it will be towed.  Taos Police Department Towing Policy at 4 (emphasis added).  See also United States v. Jacquez, 409 F.Supp.2d at 1297.  Although Reyes-Vencomo asserted that he asked an officer to permit S. Reyes or Gutierrez to take the vehicle, see Tr. at 69:17-20 (Juarez, Reyes-Vencomo), the Court determined that his testimony on this point was not credible.  Reyes-Vencomo did not indicate: (i) which officer he informed of his desire to have S. Reyes or Gutierrez to take his vehicle; (ii) what the officer's response was; or (iii) when, in the sequence of events, he made his request.  Holfelder credibly testified that only law enforcement officers were on the scene when he arrived and began the inventory search.  See Tr. at 63:2-14 (Juarez, Holfelder).  He asserted that he saw Gutierrez arrive at the scene after he did and after he began his inventory.  See Tr. at 63:17-18 (Juarez, Holfelder); Tr. at 65:25-66:11 (Torrez, Holfelder).  Accordingly, at the time he began the search, no one was available to take charge of the vehicle.  Furthermore, Holfelder testified that the traffic stop began "quite awhile" before he arrived at the scene.  Tr. at 62:22-63:10 (Juarez, Holfelder).  The New Oxford American Dictionary defines "immediately" as "at once; instantly," or "without any intervening time or space."  New Oxford American Dictionary, 869.  Whether the Court looks at the time during Reyes-Vencomo's arrest when Vigil suggested that the vehicle be towed, or at the time of Holfelder's arrival and the start of the inventory search, no one was immediately available to take charge of the vehicle.  When Reyes-Vencomo was arrested, the only person at the scene who was not a law enforcement officer was S.

-64-

Reyes, and she was also being arrested.  See Tr. at 26:9-27:12 (Torrez, Vigil); id. at 90:11-18 (Torrez, Ortega).  Accordingly, no one was immediately available to take charge of the vehicle when Reyes-Vencomo was arrested.  When back-up arrived, Vigil advised those officers to call a tow-truck, and one was called.  See Tr. at 43:9-10 (Torrez, Vigil).  Holfelder arrived at the scene and began his inventory search.  See Tr. at 51:2-13 (Holfelder).  Thus, when the Court analyzes "immediately available" from the time of the search, the Court also finds that no one was immediately available to take control of the vehicle.  Holfelder testified that he saw Gutierrez having a conversation with Vigil through the driver's door of Reyes-Vencomo's vehicle.  See Tr. at 66:3-11 (Torrez, Holfelder). The policy does not require that officers inquire whom the driver may wish to take the vehicle, that officers wait for a designated person to arrive to take the vehicle, or that, when a person arrives at the scene after the search has begun, the officer must stop the search.  See  Taos Police Department Towing Policy at 4-5.  The Fourth Amendment does not require that a defendant driver be given the opportunity to make alternative arrangements for his vehicle.  See Colorado v. Bertine, 479 U.S. at 373.   The Fourth Amendment requires only that officers comply with standardized inventory search procedures and here, the officers did.  Reyes-Vencomo was arrested, and the only other person immediately at the scene -- S. Reyes -- was also being arrested.  The officers inventoried the truck and noted the items that were found.  See Inventory at 1.  The officer testified that the policy was designed and carried out for an administrative purpose to advance the police "caretaking" function.  Tr. at 53:24-54:10 (Torrez, Holfelder); Taos Police Department Towing Policy at 3.  See Florida v. Wells, 495 U.S. at 2.  It is evident that the search was conducted according to the policy and nothing in the policy is unreasonable for Fourth Amendment purposes.

Reyes-Vencomo asserts that after the search was completed the officers were required to note the decision to tow in their reports, and that, because the officers failed to do so, the Court

should suppress the evidence. See Tr. at 119:24-120:6 (Juarez). Holfelder conceded that Vigil and Ortega did not note the decision to tow in their narrative reports. See Tr. at 64:22-65:4 (Juarez, Holfelder); Vigil Report at 1; Probable Cause at 1; Ortega Report at 1. The Court, however, construes the phrase "this decision" to refer to the driver's decision to allow someone else to take possession of his vehicle, because the police officer has no decision to make; the policy provides that if no one is immediately available the vehicle "will be towed." Taos Police Department Towing Policy at 4 (emphasis added). Accordingly, the decision to "be noted" is the defendant's decision to permit another individual to take charge of the vehicle. Noting the defendant's decision relieves the officer of liability if something then happens to the car and/or its contents. This construction is sound because it protects the police department from liability in the event that something happens to the car that the defendant has decided to let someone else driver away. Furthermore, whether Vigil and Ortega noted the decision to tow in the narrative of their police reports has no bearing on the reason for the requirement of standardization. A standardized policy is needed to ensure that inventory searches do not become "a ruse for general rummaging in order to discover incriminating evidence." Florida v. Wells, 495 U.S. at 4. The Tenth Circuit, in United States v. Cecala, 203 F.3d 836, 2000 WL 18948 (10th Cir. Jan. 12, 2000)(unpublished table decision), addressed circumstances where an officer failed to note, as the department's policy required, the contents of a suitcase on the inventory list. See 2000 WL 18948, at *2. The Tenth Circuit held that "Officer Gaines' subsequent failure to add the contents of the suitcase to the inventory list did not affect the validity of the search, for at that stage Gains had conducted, pursuant to proper police procedures, a valid inventory search that uncovered illegal contraband." United States v. Cecala, 2000 WL 18948, at *2. Similarly, in this case, Holfelder and Ortega had already conducted a valid inventory search, pursuant to police procedures, and uncovered illegal contraband. The officer failed only to take the post-search step

of noting, in their reports, the decision to tow.  The Court notes that it is unsurprising that Vigil and

Ortega should fail to note the decision to tow, because: (i) Vigil did not conduct the inventory search

and, soon after the search began, he was sent to the hospital for X-rays, see Tr. at 30:8-11 (Torrez,

Vigil); and (ii) Ortega was, at the time, a police trainee who had just begun working for the Taos

Police Department, see Tr. at 13:2-19 (Torrez, Vigil).  Their error does not demonstrate that the

search was unreasonable or that it was not "administered in a good faith."  Colorado v. Bertine, 479

U.S. at 374.  Most of the circuit courts of appeals addressing this issue have determined that minor

deviations from inventory search procedures such as this one do not violate the Fourth Amendment.

See United States v. Landon, No. 10-5439, 2011 WL 6061349, at *2 (6th Cir. Dec. 6,

2011)(unpublished)("Moreover, even if the officers had violated the policy in this way, such a

harmless violation of the policy would not have invalidated the search."); United States v. Garreau,

658 F.3d 854, 858 (8th Cir. 2011)("In any event, inventory searches need not be conducted in a

'totally mechanical, all or nothing fashion.'"); United States v. Cartwright, 630 F.3d at 616 ("In any

event, we have held that minor deviations from department policy do not render an inventory search

unreasonable."); United States v. Mundy, 621 F.3d 283, 293 (3d Cir. 2010)("Although compliance

with procedures 'tends to ensure the intrusion is limited to carrying out the government's caretaking

function,' failure to follow through with standard procedures does not necessarily render the search

unreasonable."); United States v. Battle, 370 F.App'x 426, 430 (4th Cir. 2010)(unpublished)("Even

if we credit Battle's reading of the policy, Officer Campbell was not required to follow the RPD

procedures word-for-word."); United States v. Cecala, 2000 WL 18948, at *2.

The officers initiated the search in compliance with standardized police procedures and the

requirement that the officers  make a post-search notation regarding the decision to search adds little

to the protections that the Fourth Amendment and Supreme Court precedent seeks to impose.  The

Fourth Amendment is satisfied so long as an officer conducts an inventory search in good faith. See United States v. Battle, 370 F.App'x at 430 (citing Colorado v. Bertine, 479 U.S. at 374). Holfelder and Ortega conducted an orderly inventory search, documenting and photographing the items in the vehicle as they went, and were not "general[ly] rummaging in order to discover incriminating evidence." United States v. Martinez, 512 F.3d at 1274. Holfelder explained that he understood the policy's purpose to be to protect the department and the driver's property, and nothing indicates that he was acting in bad faith. See United States v. Maraga, 76 F.App'x at 228 ("An impoundment must either be supported by probable cause, or be consistent with the police role as 'caretaker' of the streets and completely unrelated to an ongoing criminal investigation."); United States v. Lugo, 978 F.2d at 636 ("When the police acquire temporary custody of a vehicle, a warrantless inventory search of the vehicle does not offend Fourth Amendment principles so long as the search is made pursuant to 'standard police procedures' and for the purpose of 'protecting the car and its contents.'"). Failing to make a notation in the police report regarding the tow decision was a minor deviation from procedure, and an understandable one given the circumstances, and does not render the inventory search invalid.

The Court concludes that no one was "immediately available" to take charge of the vehicle when the inventory search began and that the minor notation deviation from policy does not undermine the good-faith basis for the search. Accordingly, the Court finds that the inventory search was reasonable, undertaken pursuant to a standardized policy, and does not violate the Fourth Amendment.

**IT IS ORDERED** that the Defendant's Motion and Memorandum Brief to Suppress Evidence Recovered From the Defendants' [sic] Vehicle and Post-Arrest Statements of the Defendant, filed November 30, 2011 (Doc. 31), is denied.

_____
UNITED STATES DISTRICT JUDGE


*Counsel*:

Kenneth J. Gonzales
  United States Attorney
Norman Cairns
Raul Torrez
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Santiago E. Juarez
Albuquerque, New Mexico

     *Attorney for the Defendant*